2002 UT 125

**STATE of Utah, Plaintiff and Petitioner,**

v.

**Shayne M. HANSEN, Defendant and Respondent.**

**No. 20010100.**

Supreme Court of Utah.

Dec. 20, 2002.

---

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., Nicholas M. D'Alesandro, Salt Lake City, for plaintiff.

Linda M. Jones, Otis Sterling, III, Salt Lake City, for defendant.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 This appeal concerns the validity of an automobile search. After finishing a routine traffic stop, an officer asked the defendant,

Shayne M. Hansen, for consent to search his vehicle. Hansen allegedly consented. During the search of the vehicle and subsequent search of Hansen, the officer discovered drug paraphernalia and methamphetamine.

¶ 2 Hansen filed a motion to suppress the evidence, claiming that (1) he was illegally detained by the officer because the officer's questioning and the subsequent search exceeded the scope of the initial traffic stop, (2) his consent was involuntary, and (3) the evidence seized during the search was tainted by a prior police illegality—the illegal detention. The district court denied Hansen's motion to suppress after finding both lawful detention and voluntary consent. The court of appeals reversed, concluding that Hansen was illegally detained and that he did not voluntarily consent to the search. *State v. Hansen,* 2000 UT App 353, ¶¶ 16, 25, 17 P.3d 1135.

¶ 3 We agree with the court of appeals that Hansen was illegally detained. We reverse the court of appeals' conclusion that Hansen's consent was involuntary, however. We nevertheless affirm the court of appeals' decision on the alternative ground that the search was tainted by the illegal detention.

**BACKGROUND**

¶ 4 On February 18, 1999, the State filed an information against Shayne M. Hansen for unlawful possession of a controlled substance, a third degree felony, and unlawful possession of drug paraphernalia, a class B misdemeanor. The State relied on evidence obtained by Officer Bruce Huntington during a warrantless search of Hansen and his vehicle, following a routine traffic stop. Hansen filed a motion to suppress the evidence uncovered by the search.

¶ 5 Because the legal analysis of a search and seizure case is "highly fact dependent," *see State v. Pena,* 869 P.2d 932, 940 (Utah 1994), "we recite the facts in detail[,]" *State v. Wells,* 928 P.2d 386, 387 (Utah Ct.App. 1996) (quoting *State v. Naisbitt,* 827 P.2d 969, 970 (Utah Ct.App.1992)). Where appropriate, we supplement the district court's findings with relevant testimony given by Officer Huntington during a suppression hearing held on August 4, 1999.

## I. TRAFFIC STOP OF HANSEN'S VEHICLE

¶ 6 At approximately 11:15 p.m. on December 11, 1998, Officer Huntington of the Midvale Police Department was driving behind a vehicle driven by Hansen that also contained a passenger. To determine the status of the vehicle, Officer Huntington initiated a computer check. While awaiting the results of the computer check, Officer Huntington observed Hansen make an improper lane change.[1] The computer check then revealed that Hansen's vehicle was uninsured.

¶ 7 At this point, Officer Huntington activated his patrol car's overhead emergency lights. In response, Hansen immediately pulled into the parking lot of a convenience store. Officer Huntington parked directly behind Hansen's vehicle[2] and approached it on foot.

¶ 8 Officer Huntington informed Hansen that he had stopped him for the improper lane change and for lack of insurance. In response, Hansen explained that he could not afford insurance. Officer Huntington then requested and obtained Hansen's license and registration and returned to his patrol car. Hansen and his passenger remained seated in Hansen's vehicle.

---

1. Officer Huntington testified that he observed Hansen make an illegal left-hand turn. Although Hansen was in the appropriate lane when he started the left-hand turn, as he completed the turn onto the new street he turned into the far right lane of traffic rather than the lane closest to the median. Since a driver is required by law to turn into the lane closest to the median (i.e. the extreme left-hand lane), presumably Hansen made an illegal left-hand turn in violation of Utah Code Ann. § 41–6–66 (1998). Throughout his testimony, Officer Huntington alternatively referred to the improper left-hand turn, however,

as an improper lane change. At times, the court of appeals also referred to the traffic violation as an improper lane change. Thus, to avoid confusion, we likewise will refer to the traffic violation as an improper lane change.

2. The court of appeals noted in a footnote that the record is unclear as to whether Officer Huntington impeded Hansen from leaving by parking behind him. *Hansen,* 2000 UT App 353 at ¶ 2 n. 2, 17 P.3d 1135.

¶ 9 While at his patrol car, Officer Huntington ran another computer check, which confirmed that Hansen's driver's license was valid and that Hansen had no outstanding warrants. The computer check took approximately five minutes.

¶ 10 As Officer Huntington returned to Hansen's vehicle, a second officer arrived and parked alongside Officer Huntington's patrol car. The second officer remained by the patrol cars, both of whose overhead emergency lights continued flashing throughout the remainder of the encounter with Hansen.

¶ 11 At the suppression hearing, Officer Huntington testified at length concerning his actions following his return to Hansen's vehicle. On direct, he initially testified that he advised Hansen that he was going to give him a warning about the improper lane change and for not having insurance. When questioned further about this verbal warning, he specifically recalled admonishing Hansen to obtain insurance. He conceded on cross-examination, however, that he could not recall addressing the improper lane change. In its findings of fact, the district court found that Officer Huntington had warned Hansen to obtain insurance, but made no finding regarding whether or not he had issued a warning about the improper lane change.

¶ 12 After verbally warning Hansen to obtain insurance, Officer Huntington returned his license and registration. At this point, he had been detained less than ten minutes.

¶ 13 Upon returning Hansen's documents, the officer asked him if he had any alcohol, drugs, or weapons in his vehicle. When Hansen responded, "No," Officer Huntington asked for consent to search the vehicle, even though he admitted on cross-examination that he had no reason to suspect Hansen of having any of these items. The details of this exchange were given at the suppression hearing.

¶ 14 On direct examination, Officer Huntington testified in relevant part as follows:

Q. [Prosecutor] Did you tell him he was free to leave [after returning his documents]?

A. [Officer Huntington] No.

Q. In your view, was he free to leave at that time?

A. Yes.

Q. And when you asked him for consent, do you recall now exactly how you phrased that?

A. It's my practice to ask them for consent by stating, Do you have any alcohol, weapons or drugs in the vehicle? And if they say no, I say, Well do you mind if I check?

Q. Do you recall Mr. Hansen responding to your question?

A. He did give me consent.

Q. Well first, with respect to the question as to whether he had those items in his car.

A. No. He said no.

. . . .

Q. And then you asked, Do you mind if I check?

A. [Officer Huntington] Uh-huh.

Q. And what was his response to that question?

A. He said yes.

Q. [Court] Yes, he minded?

A. Yes, I could have consent to search.

. . . .

Q. [Prosecution] Now, when you asked Mr. Hansen if you could check, what tone of voice did you use?

A. Probably the same tone of voice I'm using right now.

Q. Well, did you make any promises to him?

A. No.

Q. Did you threaten him in any way.

A. No.

Q. Did he ask any questions—did he ask any questions of you?

A. I don't recall. I think they just exited the vehicle.

¶ 15 On cross-examination, defense counsel further questioned Officer Huntington about this exchange with Hansen:

Q. [Defense Counsel] Do you recall specifically what you said to him?

A. [Officer Huntington]. Not specifically.

Q. Do you have any idea?

A. I would imagine that I stated: Do you have any alcohol, drugs or weapons in the vehicle?

Q. He said no?

A. He said no. Do you mind if I check?

Q. Okay.

A. And then he said yes.

Q. [Court] He said?

Q. [Defense Counsel] He says yes?

A. [Officer Huntington] Yes.

Q. [Court] Do you mind if I check and he says yes?

A. Well, do you mind if I check and then yes, he gave me consent. Sorry.

Q. [Defense Counsel] So you said he gave you consent?

A. Yes, he did give me consent.

Q. What did he say?

. . . .

A. I don't recall exactly other than it was consent.

Q. So you don't recall his exact words?

A. Not exactly.

Q. So are you assuming that he said yes?

A. I assume he said yes.

. . . .

Q. Nothing more than that?

A. He probably could have said, yes, go ahead.

Q. But you don't recall him saying that.

A. I don't recall.

¶ 16 After this exchange, Officer Huntington asked Hansen and his passenger to exit the vehicle and stand next to the other officer. When Officer Huntington searched the vehicle, he found a marijuana pipe on the floorboard of the driver's area. When questioned, Hansen admitted the object was his. Officer Huntington then arrested him and searched him incident to the arrest. During the search incident to arrest, Officer Huntington discovered methamphetamine.

## II. DISTRICT COURT REJECTS HANSEN'S MOTION TO SUPPRESS

¶ 17 On July 2, 1999, Hansen filed a motion to suppress evidence uncovered by the search. In his motion, Hansen argued that: (1) Officer Huntington illegally detained him by exceeding the scope of the traffic stop, (2) he did not give voluntary consent to the search, and (3) any evidence obtained from the search was tainted by the illegal detention.

¶ 18 On August 4, 1999, the district court held a hearing on Hansen's motion to suppress where Officer Huntington testified about the stop and search of Hansen's vehicle. Following the suppression hearing, the district court expressly stated that Officer Huntington was a credible witness, and it found that his testimony established Hansen clearly and unequivocally consented to the search of his vehicle.

¶ 19 The court also ruled that Hansen's consent was voluntary, supporting this ruling with several findings of fact. First, the court found that "[t]he officer's question was permissive and did not suggest that he had a right to search." Second, the court found that "[t]here was no coercive conduct on the part of the officer to secure defendant's consent to search." Third, the court found that the officer's "demeanor, voice, and stature were not coercive in nature." Finally, the court found that "there were no other officers surrounding defendant" when the officer sought Hansen's consent.

¶ 20 In addition, the court ruled that Hansen was not seized at the time Officer Huntington sought his consent because, "[f]rom an objective viewpoint, defendant was clearly free to leave after his documents had been returned to him."

¶ 21 Accordingly, the court denied Hansen's motion to suppress the methamphetamine and drug paraphernalia that were seized during Officer Huntington's search. Hansen then pleaded guilty to one count of illegal possession of a controlled substance, a third degree felony, but reserved his right to appeal the district court's rulings from the suppression hearing.

## III. COURT OF APPEALS REVERSES DISTRICT COURT

¶ 22 On appeal, the court of appeals concluded that Hansen was seized at the time Officer Huntington sought his consent to the search because no reasonable person in Hansen's position would have felt free to decline Officer Huntington's request, terminate the encounter, and go about his or her business. *Hansen*, 2000 UT App 353 at ¶ 15, 17 P.3d 1135. The court of appeals based its conclusion on several factors. First, it emphasized that although Officer Huntington returned Hansen's documents, he did not tell Hansen he was free to go. *Id.* at ¶ 13. Rather, he immediately confronted Hansen with investigatory questions after returning the documents, and such questioning would have tended to cause a reasonable person to believe he or she was still detained. *Id.* at ¶ 14. Second, the patrol cars' overhead lights remained flashing, and the other officer remained outside his vehicle throughout the encounter. *Id.* at ¶ 15. Finally, Officer Huntington did not indicate how he intended to handle the illegal lane change. *Id.*

¶ 23 Additionally, the court of appeals found that Officer Huntington illegally prolonged Hansen's detention by asking questions concerning contraband that were not based on reasonable suspicion or reasonably related in scope to the traffic violations that initially justified the traffic stop. After concluding that Hansen was illegally seized at the time Officer Huntington sought his consent to search his vehicle, the court of appeals went on to rule that the district court erred in concluding that Hansen had consented voluntarily. *Id.* at ¶ 25. Accordingly, the court of appeals ruled that the district court erred in denying Hansen's motion to suppress. *Id.* at ¶ 26.

¶ 24 We granted the State's petition for a writ of certiorari. We have jurisdiction pursuant to Utah Code Ann. § 78–2–2(3)(a) (2002).

## ANALYSIS

### I. STANDARD OF REVIEW

 ¶ 25 "When exercising our certiorari jurisdiction, we review the decision of the court of appeals and not that of the district court." *Longley v. Leucadia Fin. Corp.*, 2000 UT 69, ¶ 13, 9 P.3d 762. "On certiorari, we review the decision of the court of appeals for correctness." *Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 11, 48 P.3d 968.

 ¶ 26 If a case involves a mixed question of fact and law,[3] we afford some measure of discretion to the district court's application of the law. *Pena*, 869 P.2d at 937. The measure of discretion afforded varies, however, according to the issue being reviewed. *Id.* at 937–38. When a case involves consent to a search, we afford little discretion to the district court, *id.* at 938, because there must be "state-wide standards that guide law enforcement and prosecutorial officials." *State v. Thurman*, 846 P.2d 1256, 1271 (Utah 1993). State-wide standards also help ensure different trial judges will reach the same legal conclusion in cases that have little factual difference. *See Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (citation omitted). Because this case involves the legality of a search and seizure, the district court's determination of law on these issues should have been afforded little deference by the court of appeals. With these standards in mind, we now review the court of appeals' decision.

### II. HANSEN WAS ILLEGALLY SEIZED WHEN OFFICER HUNTINGTON BEGAN QUESTIONING HIM ABOUT CONTRABAND

¶ 27 The court of appeals concluded Hansen was illegally seized at the time Officer Huntington began questioning him about alcohol, drugs, and weapons. We agree.

---

**3.** A mixed question involves "the application of law to fact or, stated more fully, the determination of whether a given set of facts comes within the reach of a given rule of law." *State v. Pena*, 869 P.2d 932, 936 (Utah 1994).

## A. Scope of a Traffic Stop

¶ 28 The Fourth Amendment of the United States Constitution prohibits unreasonable seizures. U.S. Const. amend. IV. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendment[ ], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Although a traffic stop is a seizure within the meaning of the Fourth Amendment, a reasonable traffic stop is constitutional.

¶ 29 To determine whether a traffic stop was reasonable, we consider two questions: "(1) Was the police officer's action justified at its inception? and (2) Was the resulting detention reasonably related in scope to the circumstances that justified the interference in the first place?" *State v. Lopez*, 873 P.2d 1127, 1131–32 (Utah 1994) (internal quotations omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

¶ 30 As to the first question, a traffic stop is justified at its inception when "the stop is 'incident to a traffic violation committed in [an officer's] presence.'" *Lopez*, 873 P.2d at 1132 (quoting *State v. Talbot*, 792 P.2d 489, 491 (Utah Ct.App.1990)). *See also United States v. Bustillos–Munoz*, 235 F.3d 505, 512 (10th Cir.2000) (noting a traffic stop is justified if the "'the stop is based on an observed traffic violation.'" (quoting *United States v. Botero–Ospina*, 71 F.3d 783, 787 (10th Cir.1995) (en banc))), *cert. denied*, 534 U.S. 854, 122 S.Ct. 127, 151 L.Ed.2d 81 (2001). Here, Officer Huntington initiated a traffic stop because he observed Hansen make an improper lane change and he reasonably suspected that Hansen was driving without vehicle insurance. Based on these facts, the initial stop by Officer Huntington was reasonable.

¶ 31 Regarding the second question, during a traffic stop an officer "may request a driver's license and vehicle registration, conduct a computer check, and issue a citation." *Lopez*, 873 P.2d at 1132 (quotations and citations omitted); *United States v.*

*Walker*, 933 F.2d 812, 815 (10th Cir.1991) (same). Once the purpose of the initial stop is concluded, however, the person must be allowed to depart. "'Any further temporary detention for investigative questioning after [fulfilling] the purpose for the initial traffic stop'" constitutes an illegal seizure, unless an officer has probable cause or a reasonable suspicion of a further illegality. *State v. Godina–Luna*, 826 P.2d 652, 655 (Utah Ct. App.1992) (quoting *State v. Robinson*, 797 P.2d 431, 435 (Utah Ct.App.1990)); *see also Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (stating that a traffic stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop").

¶ 32 In this case, after Officer Huntington verified Hansen's license and registration and completed a computer check, the purpose for the initial traffic stop was concluded. Yet, Officer Huntington extended the encounter by questioning Hansen about whether he had alcohol, drugs, or weapons in his vehicle and by asking if he could search his vehicle for these items. Officer Huntington conceded he had no reasonable suspicion of a further illegality to justify the additional questioning. Rather, he engaged in such questioning as a matter of practice. Since the scope of questioning exceeded, without justification, the purpose of the initial traffic stop, the continued encounter was illegal unless some other circumstance justified the additional questioning.

## B. De-escalation from a Seizure to a Consensual Encounter

¶ 33 A traffic stop that begins as a seizure may de-escalate to a mere consensual encounter. As a general framework, there are "three [different] levels of police encounters with the public." *State v. Deitman*, 739 P.2d 616, 617 (Utah 1987) (citing *United States v. Merritt*, 736 F.2d 223, 230 (5th Cir.1984)); *see also United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir.1990) (stating that there are "three categories of citizen encounters with law enforcement officials"). Because each level has different legal rules that apply, we turn now to a discussion of the different levels.

1. Types of Citizen Encounters with Law Enforcement Officials

 ¶ 34 A level one citizen encounter with a law enforcement official is a consensual encounter wherein a citizen voluntarily responds to non-coercive questioning by an officer. *Id.* Since the encounter is consensual, and the person is free to leave at any point, there is no seizure within the meaning of the Fourth Amendment. *Royer,* 460 U.S. at 498–99, 103 S.Ct. 1319.

 ¶ 35 A level two encounter involves an investigative detention that is usually characterized as brief and non-intrusive. *United States v. Evans,* 937 F.2d 1534, 1537 (10th Cir.1991); *see also Werking,* 915 F.2d at 1407 (noting a level two encounter is an investigative detention or "*Terry* stop"). Although it is a Fourth Amendment seizure, probable cause is not required. *Evans,* 937 F.2d at 1537. Rather, when "specific and articulable facts and rational inferences ... give rise to a reasonable suspicion a person has or is committing a crime," an officer may initiate an investigative detention without consent. *Werking,* 915 F.2d at 1407.

 ¶ 36 A level three encounter involves an arrest, which has been "characterized [as a] highly intrusive or lengthy detention [that] requires probable cause." *Id.* A level three encounter is also a Fourth Amendment seizure. *Id.*

 ¶ 37 Typically, a traffic stop is considered to be an investigative detention (i.e., a level two encounter). *Walker,* 933 F.2d at 815. A person is seized, but usually the seizure is not highly intrusive or lengthy. *See United States v. Melendez–Garcia,* 28 F.3d 1046, 1052 (10th Cir.1994) (stating that for a seizure to be merely investigatory, it must be "sufficiently limited in scope and duration"). While a traffic stop may begin as an investigatory detention, it is possible for it to de-escalate to a consensual encounter. *See State v. Higgins,* 884 P.2d 1242, 1244–45 (Utah 1994); *Werking,* 915 F.2d at 1408. Since a consensual encounter is not a seizure, questioning during such an encounter is lawful, regardless of scope, as long as the person remains a willing participant. *See Royer,*

460 U.S. at 498–99, 103 S.Ct. 1319; *Walker,* 933 F.2d at 817.

¶ 38 Thus, it is important to determine whether Hansen's encounter with Officer Huntington had de-escalated from an investigatory detention to a consensual encounter before Hansen was asked additional questions. We conclude the detention had not de-escalated.

2. Determining Whether a Traffic Stop De-escalated to a Consensual Encounter

 ¶ 39 A traffic stop de-escalates to a consensual encounter when a reasonable person would believe, based on the totality of the circumstances, that he or she is free to end the encounter and depart. *See Higgins,* 884 P.2d at 1244; *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (expressing minority opinion that has since become the opinion of the Court); *Royer,* 460 U.S. at 502, 103 S.Ct. 1319. If a reasonable person would not believe he or she is free to leave or disregard questioning, however, the encounter remains an investigatory detention.

 ¶ 40 As a threshold matter, " 'an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him,' " *United States v. Gregory,* 79 F.3d 973, 979 (10th Cir.1996) (quoting *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994)), because absent the return of documents, a person "legally could not proceed on his way," *Werking,* 915 F.2d at 1409. Since Officer Huntington returned Hansen's license and registration to him prior to the additional questioning, this threshold requirement was met.

 ¶ 41 Although no single factor is dispositive, factors tending to show de-escalation include informing a person he is free to leave, or that he does not have to answer additional questions. *Ohio v. Robinette,* 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 231, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). In contrast, failure to issue a warning or citation before engaging in additional questioning weighs against de-

escalation. Likewise, a " 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled,' " also weighs against de-escalation. *United States v. Elliott,* 107 F.3d 810, 814 (10th Cir.1997) (quoting *United States v. Turner,* 928 F.2d 956, 959 (10th Cir.1991)).

¶ 42 The State argues that none of the factors pertaining to a coercive show of authority were present at the time of the additional questioning, and therefore, the detention had de-escalated to a consensual encounter. We disagree for two reasons.

¶ 43 First, the factual differences between the initial traffic stop and the additional questioning were minimal. During the initial traffic stop, Officer Huntington was the only officer present. While he was armed, there was no evidence that he displayed his weapon or physically touched Hansen. Thus, factors demonstrating a coercive show of authority were absent at the time of the initial seizure. Since these factors were never present to begin with, a reasonable person would not be able to discern that a seizure had de-escalated to a consensual encounter due to the absence of such factors at the time of additional questioning.

¶ 44 Second, at the time of the additional questioning, there was an arguably threatening presence of more than one officer. As Officer Huntington walked back to Hansen's vehicle to return his documents, another patrol car appeared on the scene. The second patrol car had its lights flashing, and it pulled in behind Hansen's vehicle. The second officer stepped out of his vehicle and stood next to Officer Huntington's patrol car. Only then did Officer Huntington ask Hansen about alcohol, drugs, and weapons, and request to search his vehicle. Thus, a reasonable person actually may have believed that the encounter was escalating rather than de-escalating.

¶ 45 Other factors during the encounter also tend to show Hansen was still seized. Officer Huntington informed Hansen that he detained him because he had made an illegal lane change and had no vehicle insurance.

Yet, when Officer Huntington returned Hansen's license and registration to him he did not address the illegal lane change before he started questioning Hansen about contraband. Furthermore, Officer Huntington did not tell Hansen that he was free to leave or that he did not have to answer the additional questions. We question whether a reasonable person would feel free to leave before being issued a warning or citation, or at least being told he or she could leave.

¶ 46 Looking at these factors in totality, we conclude Hansen's detention had not de-escalated to a consensual encounter at the time of the additional questioning; and thus, he was illegally seized. We therefore affirm the court of appeals' decision on this issue. Although we conclude that Officer Huntington's questioning exceeded the scope of the traffic stop and that the stop had not de-escalated to a consensual encounter at the time of the additional questioning, evidence obtained from the search may nevertheless be admitted if Hansen consented to the search and the consent was sufficiently attenuated from Officer Huntington's prior illegality. We now address these issues.

## III. ADMISSIBILITY OF EVIDENCE SEIZED FOLLOWING AN ILLEGAL DETENTION

¶ 47 While the Constitution prohibits unreasonable searches and seizures, it does not expressly preclude using "evidence obtained in violation of its commands." *United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). When police illegally detain an individual, evidence obtained during a subsequent search may nevertheless be admitted if the person gave valid consent to the search. *State v. Thurman,* 846 P.2d 1256, 1262 (Utah 1993) (citing *State v. Arroyo,* 796 P.2d 684, 688 (Utah 1990)). Hence, even though we have concluded Hansen was illegally seized, evidence obtained during the subsequent search of Hansen and his vehicle may be admitted if Hansen gave valid consent to the search. A consent is valid only if "(1) [t]he consent was given voluntarily, and (2) the consent was not obtained by police exploitation of the prior

illegality." *Id.* We turn now to the first prong of the test.

### A. Voluntary Consent

#### 1. Consent Is a Factual Finding

 ¶ 48 Before a court addresses whether consent was voluntary, it must first determine that there was consent. Consent is a factual finding that should be made based on the totality of the circumstances. *State v. Durand,* 569 P.2d 1107, 1108–09 (Utah 1977). Since a district court is in a unique position to assess the credibility of witnesses and weigh the evidence, *Thurman,* 846 P.2d at 1271 (citing *State v. Vigil,* 815 P.2d 1296, 1299 (Utah Ct.App.1991)), the court of appeals may not substitute its judgment as to a factual question unless the district court's finding is clearly erroneous. *Id.* Here, the district court entered a finding of fact that Hansen had consented to the search, which the court of appeals held was clearly erroneous. *See State v. Hansen,* 2000 UT App 353, ¶¶ 21, 25, 17 P.3d 1135. We therefore review whether the court of appeals properly substituted its judgment for that of the district court.

 ¶ 49 Officer Huntington asked Hansen if he had any alcohol, drugs, or weapons in the vehicle. Hansen responded, "No." Officer Huntington then asked, "Do you mind if I check?" Hansen responded, "Yes." Officer Huntington clarified during the suppression hearing that Hansen's response meant "Yes, I could have consent to search." Hansen did not take the stand to challenge this statement.[4]

 ¶ 50 Hansen's response of, "Yes," was ambiguous. But, the only evidence before the court regarding its meaning was

Officer Huntington's statement. The fact that Hansen chose not to challenge the officer's statement has some significance in this instance. Based on these facts, we cannot conclude the district court's finding was clearly erroneous, and therefore, we reverse the court of appeals'. decision on this issue. We emphasize, however, that the evidence in support of this conclusion, while adequate, was far from ideal. We now address whether Hansen's consent was voluntary.

#### 2. Voluntariness Is a Legal Conclusion

 ¶ 51 While consent is a factual finding, voluntariness is a legal conclusion, which is reviewed for correctness. *Thurman,* 846 P.2d at 1271. When the State attempts to prove that there was voluntary consent after an illegal detention, it " 'has a much heavier burden to satisfy than when' " consent is given after a permissible detention. *Arroyo,* 796 P.2d at 687–88 (quoting *United States v. Melendez–Gonzalez,* 727 F.2d 407, 414 (5th Cir.1984)).

¶ 52 Although the burden of proving voluntary consent is heavier after an illegal detention, the standard used by the court of appeals to determine voluntariness imposed too heavy a burden on the State. To prove voluntariness, the court of appeals required the State to show by clear, positive, and unequivocal testimony that Hansen's consent was freely and intelligently given. *Hansen,* 2000 UT App 353 at ¶ 13, 17 P.3d 1135. Additionally, it indulged every reasonable presumption against waiver of Hansen's constitutional rights. *Id.* at ¶ 25. This standard is incorrect. Since there has been some confusion concerning the appropriate standard for determining voluntariness, we now clarify the appropriate standard.[5]

---

4. Hansen could have offered testimony during the suppression hearing that controverted the officer's testimony without waiving his Fifth Amendment constitutional right against self-incrimination because such testimony is not admissible at trial. The United States Supreme Court has held that "testimony given by a defendant in support of a motion to suppress cannot be admitted as evidence of his guilt at trial." *United States v. Salvucci,* 448 U.S. 83, 88, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Without this rule, a defendant would have to surrender his Fifth Amendment privilege against self-incrimination

in order to assert a valid Fourth Amendment claim. *Id.*

5. The standard used by the court of appeals actually originated from a Tenth Circuit Court of Appeals decision. *See United States v. Abbott,* 546 F.2d 883, 885 (10th Cir.1977) (citing *Villano v. United States,* 310 F.2d 680, 684 (10th Cir. 1962)); *see also United States v. Medlin,* 842 F.2d 1194, 1197 (10th Cir.1988). As will be discussed below, however, the standard has been modified by the United States Supreme Court.

#### a. Test Used By the Court of Appeals

¶ 53 In its analysis, the court of appeals employed the following three-prong test for determining whether a person voluntarily consented to a search:

> (1) There must be clear and positive testimony that the consent was "unequivocal and specific" and "freely and intelligently given"; (2) the government must prove consent was given without duress or coercion, express or implied; and (3) [when evaluating these first two standards, we] indulge every reasonable presumption against the waiver of fundamental constitutional rights and there must be convincing evidence that such rights were waived.

*Id.* at ¶ 18 (alteration in the original) (quoting *State v. Ham*, 910 P.2d 433, 439 (Utah Ct. App.1996) (citations omitted)).

¶ 54 The first prong of the *Ham* test provides that consent must be "intelligently" given. *Id.* at ¶ 22 (citing *Ham*, 910 P.2d at 439). To the extent this implies a person must have knowledge of the right to refuse consent, the test is incorrect. In *Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the United States Supreme Court held that a person's "knowledge of [the] right to refuse [consent] is a factor to be taken into account, [but] the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *See generally Ohio v. Robinette*, 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (rejecting requirement that police officers must "inform detainees that they are free to go before a consent to search may be deemed voluntary"). We follow this pronouncement.

¶ 55 The third prong of the *Ham* test, employing a presumption against waiver, is also incorrect. Specifically, the United States Supreme Court has stated as follows: "it cannot be said every reasonable presumption ought to be indulged against voluntary relinquishment" of the right to refuse consent. *Schneckloth*, 412 U.S. at 243, 93 S.Ct. 2041. Later, the Tenth Circuit reiterated that "application of the presumption against waiver [is] improper." *United States v. Price*, 925 F.2d 1268, 1271 (10th Cir.1991).

Hence, the court of appeals erred in indulging every reasonable presumption against waiver.

#### b. Appropriate Test to Determine Voluntariness

¶ 56 The appropriate standard to determine voluntariness is the totality of the circumstances test, and the burden of proof is by preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Under the totality of the circumstances test, a court should carefully scrutinize both the details of the detention, and the characteristics of the defendant. *Schneckloth*, 412 U.S. at 226, 248, 93 S.Ct. 2041.

¶ 57 The totality of the circumstances must show consent was given without duress or coercion. *Id.* at 248, 93 S.Ct. 2041; *United States v. Zubia–Melendez*, 263 F.3d 1155, 1162 (10th Cir.2001) (citing *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir.1996)). In other words, a person's will cannot be overborne, nor may "his capacity for self-determination [be] critically impaired." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041 (citation omitted); *United States v. Melendez–Garcia*, 28 F.3d 1046, 1053 n. 4 (10th Cir.1994). With respect to a defendant, "evidence of minimal schooling, low intelligence, and the lack of any effective warnings [about] his rights" should be considered. *Schneckloth*, 412 U.S. at 248, 93 S.Ct. 2041. Further, we have stated that

> [f]actors which may show a lack of duress or coercion include: 1) the absence of a claim of authority to search by the officers; 2) the absence of an exhibition of force by the officers; 3) a mere request to search; 4) cooperation by the owner of the vehicle; and 5) the absence of deception or trick on the part of the officer.

*State v. Whittenback*, 621 P.2d 103, 106 (Utah 1980).

#### c. Reviewing Voluntariness Under the Totality of the Circumstances Test

¶ 58 Applying the law to the facts of this case, we disagree with the court of appeals' conclusion that Hansen's consent was involuntary. The following facts of this case

tend to show that Hansen consented voluntarily to the search. Officer Huntington did not claim any authority to search the vehicle. Rather, he asked a permissive question—"Do you mind if I search?" No threat accompanied the request. Nor did the officer employ deception to garner consent, such as trying to deceive Hansen into thinking he could get a search warrant. Officer Huntington's tone of voice was even, rather than demanding. The length of the detention, while illegal, was brief, and the questioning was neither repeated nor prolonged. Finally, Hansen cooperated in the search.

 ¶ 59 On the other hand, the timing of Officer Huntington's request, as well as the timing of the second officer's arrival, may have implied Hansen could not refuse consent. Additionally, Hansen was never told he could refuse to consent.[6]

¶ 60 Weighing each of these factors under the totality of the circumstances test, it does not appear that Hansen's will was overborne, or that his capacity for self-determination was critically impaired. Thus, we conclude Hansen's consent was voluntary and reverse the court of appeals on this issue. We now turn to the second prong of the test used to determine whether a consent was valid.

### B. Police Exploitation of a Prior Illegality

 ¶ 61 The second prong of the test for determining valid consent involves an exploitation analysis. Whether a person's consent was obtained by police exploitation of a prior illegality is ultimately a legal conclusion reviewed for correctness. *Thurman,* 846 P.2d at 1271–72. Because the court of appeals concluded Hansen's consent was involuntary, it did not address the second prong of the test. Likewise, the district court did not address this prong because it concluded Hansen's detainment was lawful and that Hansen had voluntarily consented to the search. Although the district court did not make specific findings of fact regarding the issue of exploitation, remand is not necessary because the record is sufficient for us to conclude consent was obtained by police exploitation of a prior illegality, the unlawful detention.

### 1. Purpose of the Exploitation Analysis

 ¶ 62 Evidence obtained by police exploitation of a prior illegality is tainted by the violation of a person's constitutional rights. *See State ex rel. A.R. v. C.R.,* 1999 UT 43, ¶ 15, 982 P.2d 73 (citing *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). When conducting an exploitation analysis, a court "evaluates the relationship between official misconduct and subsequently discovered evidence to determine if excluding the evidence will effectively deter future illegalities." *State v. Shoulderblade,* 905 P.2d 289, 292 (Utah 1995). Thus, the purpose behind excluding evidence obtained by police exploitation is " 'to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " *Brown v. Illinois,* 422 U.S. 590, 599–600, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (quoting *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)).

¶ 63 When conducting the exploitation analysis, we always keep in mind this deterrence purpose. *Thurman,* 846 P.2d at 1263 (citing *Brown,* 422 U.S. at 612, 95 S.Ct. 2254 (Powell, J., concurring)). Moreover, we recognize the need for deterrence is strongest where criminal sanctions against the defendant may result. *State ex rel. A.R.,* 1999 UT 43 at ¶ 16, 982 P.2d 73 (citing *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). With these principles in mind, we now turn to the facts of this case.

### 2. Factors Relevant to an Exploitation Analysis

 ¶ 64 An exploitation analysis requires looking at the facts of each case. The

---

**6.** States are not precluded from requiring their police officers to inform citizens that they have the right to refuse consent. *See Robinette,* 519 U.S. at 42, 117 S.Ct. 417 (Ginsburg, J., concurring). Although we are not imposing a "first-tell-then-ask rule" today, *id.,* we note that "officer[s] who include[ ] such a warning in [their] request for consent undoubtedly present[ ] a stronger case for a finding of voluntariness in a suppression hearing," *id.* at 52 n. 12, 117 S.Ct. 417 (Stevens, J., dissenting) (quotation and citation omitted).

United States Supreme Court has noted three factors that have particular relevance in reviewing the facts: (1) the "purpose and flagrancy" of the illegal conduct, (2) "the presence of intervening circumstances," and (3) the "temporal proximity" between the illegal detention and consent. *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254.

¶ 65 "The 'purpose and flagrancy' factor directly relates to the deterrent value of suppression." *Thurman,* 846 P.2d at 1263. Where the purpose of the illegal conduct is to obtain consent, suppressing evidence derived from the illegal conduct "clearly will have a deterrent effect." *Id.* at 1264.

¶ 66 Here, Officer Huntington testified, "It's my practice to ask them for consent by stating, Do you have any alcohol, weapons or drugs in the vehicle? And if they say no, I say, Well, do you mind if I check." Officer Huntington employed this practice with Hansen, even though he had no reasonable suspicion of a further illegality. Seeking consent under such circumstances shows the purpose of the illegal detention "was to exploit the opportunity to ask for consent." *Shoulderblade,* 905 P.2d at 294. It also shows there was a direct connection between Officer Huntington's misconduct and Hansen's consent.

¶ 67 "The incentive present in this case to violate constitutional guarantees . . . is precisely the type of incentive that must be removed. . . ." *Id.* Since there was a direct connection between the purpose of the misconduct and Hansen's consent, suppressing the evidence derived from this misconduct should have a deterrent effect.

¶ 68 Next, we consider whether there were any intervening factors between Officer Huntington's misconduct and Hansen's consent that may have mitigated the illegality. Intervening circumstances may include such events as an officer telling a person he or she has the right to refuse consent or to consult with an attorney. *United States v. McKines,* 933 F.2d 1412, 1430 (8th Cir.1991) (citing *United States v. Berry,* 670 F.2d 583, 605 (5th Cir.1982)). In this case, the record reveals no intervening circumstances, no "clean break in the chain of events between the misconduct and the . . . consent." *Thurman,* 846 P.2d at 1274. Thus, the illegality of Officer Huntington's conduct was not mitigated.

¶ 69 Finally, we address the temporal proximity between the illegal detention and consent. "A brief time lapse between a Fourth Amendment violation and consent often indicates exploitation because the effects of the misconduct have not had time to dissipate." *Shoulderblade,* 905 P.2d at 293 (citing *Melendez–Garcia,* 28 F.3d at 1055). Here, the lapse of time was negligible. The illegal detention began when Officer Huntington asked Hansen if he had any contraband in his vehicle. Directly after Hansen answered, "No," Officer Huntington requested and received permission to search Hansen's vehicle. Thus, no appreciable time passed between the illegal detention and the consent that would have allowed the taint of the misconduct to dissipate.

¶ 70 Based on the purpose behind Officer Huntington's misconduct, the lack of intervening circumstances, and the temporal proximity between the illegal conduct and Hansen's consent, we conclude that Hansen's consent resulted from exploitation of the prior police illegality. We also conclude that the deterrent effect of suppressing evidence obtained from this type of search and seizure justifies its cost. We therefore affirm the court of appeals' decision that the district court erred in denying Hansen's motion to suppress.

## CONCLUSION

¶ 71 We conclude that Hansen was illegally seized at the time Officer Huntington began questioning him about alcohol, drugs, and weapons. Officer Huntington's questions in this regard exceeded the scope of the initial traffic stop. Additionally, the initial traffic stop had not de-escalated to a consensual encounter because a reasonable person would not have felt free to leave under the circumstances. Thus, Hansen was illegally seized at the time of the additional questioning.

¶ 72 We further conclude that the evidence obtained during the subsequent search of

Hansen and his vehicle should have been suppressed because Hansen's consent was invalid. Valid consent requires showing: (1) the consent was voluntarily given, and (2) the consent was not obtained by police exploitation of a prior illegality.

¶ 73 While we conclude Hansen's consent was voluntary, we nevertheless conclude the consent was invalid because it was obtained by police exploitation of a prior illegality. The purpose and flagrancy of the illegal conduct, the presence of intervening factors, and the temporal proximity between the illegal detention and consent weigh into the exploitation analysis. Here, the purpose behind Officer Huntington's illegal conduct was to obtain consent to search Hansen's vehicle. Second, there were no intervening factors between the misconduct and the consent. Third, the temporal proximity between the police illegality and Hansen's consent was very close. These factors show Hansen's consent was obtained by police exploitation of the illegal seizure.

¶ 74 Because Hansen was illegally seized and his consent to the search was obtained by police exploitation of a prior illegality, we affirm the court of appeals' decision that the district court erred in denying Hansen's motion to suppress.

¶ 75 Chief Justice DURHAM, Justice HOWE, Justice RUSSON, and Justice WILKINS concur in Associate Chief Justice DURRANT's opinion.