THORNE, Judge
(dissenting):
1 41 I respectfully dissent from the majority opinion. Although the majority opinion marshals an impressive body of case law from other jurisdictions in support of its analysis, I disagree with its ultimate conclusion that suppression of the evidence in this case is not necessary to deter police misconduct. I believe that this case is most appropriately analyzed under State v. Topanotes, 2008 UT 30, 76 P.3d 1159, a Utah Supreme Court case with remarkably similar factual underpinnings that strongly suggests that suppression is required here.
T 42 In Topanotes, two police officers had gone to the home of a recently-arrested prostitute to confirm her actual residence. See id. 12. While there, the officers encountered a woman-Topanotes-who matched a description of someone else who allegedly lived at the house. See id. Although the officers had no reasonable suspicion or probable cause regarding Topanotes, they nevertheless "stopped her and asked for identification" and then "perform[ed] a warrants check as part of 'routine procedure' or 'common practice'" while retaining Topanotes's identification card. See id. When the warrants check revealed outstanding warrants for To-panotes, the officers arrested her, searched her incident to arrest, and discovered heroin on her person. See id. ¶ 3. The Utah Supreme Court ultimately held that the heroin should be suppressed despite the existence of the warrants. See id. 122.
T48 I find the factual situations in the instant case and Topanotes to be indistinguishable for purposes of a Fourth Amendment attenuation analysis. In both cases, the defendants were on foot when they were stopped and asked for identification without reasonable suspicion or probable cause. In both cases, the police then illegally detained the individuals by retaining their identification cards while performing routine warrants checks.[1] And in both eases, the police found *336 outstanding warrants, arrested the defendants on the warrants, searched them incident to their arrests, and found contraband in their possession.
1[ 44 What does distinguish Topanotes from this case is the specific legal doctrine at issue. In Topanotes, the State argued for application of the inevitable discovery doctrine, which "enables courts to look to the facts and cireumstances surrounding the discovery of the tainted evidence and asks whether the police would have discovered the evidence despite the illegality." See id. 114. In this case, we are called upon to apply the related doctrine of attenuation, whereby evidence that is derivative of an illegal search or seizure will not be suppressed if obtained "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). These two exceptions to the exclusionary rule-along with a third exception, the independent source doctrine-are "closely related but analytically distinct." See United States v. Terzado-Madruga, 897 F.2d 1099, 1118 (11th Cir.1990).
145 Even in light of the distinct legal doctrines involved, however, Topanotes's inevitable discovery analysis remains potent authority for the "closely related" attenuation analysis at issue in the present case, see id., particularly considering the nearly identical factual circumstances in the two cases. Reviewing the Topanotes analysis, it is clear that the supreme court made rulings that are applicable to each of the three attenuation factors employed by the majority in this case. Examining those three factors in light of Topanotes leads me to the inevitable conclusion that the evidence in this case should be suppressed.
146 As noted above, the district court in this case relied on the doctrine of attenuation to determine that the evidence against Strieff need not be suppressed notwithstanding its discovery after Strieffs illegal detention. Utah courts have adopted a three-part test to determine when attenuating cireumstances will purge evidence or statements from a prior illegality by police. See State v. Arroyo, 796 P.2d 684, 691 n. 4 (Utah 1990) (adopting " 'temporal proximity of the arrest and the confession, the presence of intervening circumstances,"" and "'the purpose and flagrancy of the official misconduct " as relevant factors in determining whether exploitation of police illegality has occurred) (quoting Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). In the context of a warrant discovered after an illegal detention, the attenuation test considers the temporal proximity of the initial illegality to the discovery of the warrant, the presence of intervening cireumstances, and the purpose and flagrancy of the illegal misconduct. Cf. State v. Newland, 2010 UT App 380, ¶¶ 11-26, 253 P.3d 71 (applying the three-part attenuation test in the context of consent following an illegal search).
{47 As to the first prong of this test, the majority opinion adopts the district court's finding that the time that had elapsed from Strieff's illegal detention to the discovery of the warrant and the resulting search incident to his arrest was "relatively short." Since the discovery of the warrant had actually occurred during Strieff's illegal detention, I would go further and characterize the warrant discovery and the illegal detention as contemporaneous. Cf. State v. Topanotes, 2003 UT 30, ¶ 19, 76 P.3d 1159 (stating that "the warrants check [was] performed contemporaneously with the illegal detention"). Nevertheless, the majority and I are in agreement that the first prong of the attenuation test weighs in favor of suppression.
148 I do, however, disagree with the majority's conclusion that the contemporaneous nature of the detention and the discovery of Strieff's warrant is "of relatively little weight under the cireumstances of this case." See swpro 129. As a purely practical matter, the *337 contemporaneous nature of the detention and the warrant check deprived Strieff of the opportunity to leave the seene or terminate the otherwise "voluntary" encounter.[2] CJ id. 1 20 ("We find 'most unrealistic' the assumption that Topanotes would have waited for the police to check for warrants and arrest her with heroin in her possession even if she had not been unlawfully detained."). The temporal confluence of the illegal detention and the warrants check thus played a very direct role in the discovery of the warrant and the ultimate discovery of the contraband.
T49 As to the second attenuation factor, I acknowledge that other courts have determined that the discovery of an arrest warrant constitutes an "intervening cireum-stance" for purposes of an attenuation analysis. See, e.g., People v. Brendlin, 45 Cal.4th 262, 85 Cal.Rptr.3d 496, 195 P.3d 1074, 1076 (2008). However, under Utah law, there is nothing intervening about the discovery of Strieff's warrant. "Intervening circumstances are events that create a clean break in the chain of events between the misconduct and the [discovery of a warrant]." Newland, 2010 UT App 380, 15, 253 P.3d 71 (internal quotation marks omitted).[3] Officer Fackrell's discovery of Strieff's warrant was no "clean break in the chain of events," see id., but rather was the natural and immediate result of Officer Fackrell illegally detaining Strieff and calling in a warrants check during that detention. Under similar circumstances, the Utah Supreme Court has intimated as much. See Topanotes 2003 UT 30, ¶ 19, 76 P.3d 1159 ("There must be some other circumstance, something outside the warrants check performed contemporaneously with the illegal detention, supporting inevitable discovery 'to prevent the' inevitable discovery exception from swallowing the exclusionary rule'" (emphasis added)). In similar fashion, I see no intervening circumstances between the initial illegality here and the discovery of Strieffs warrant.[4]
*338 " 50 I also conclude that the third attenuation factor-whether Officer Fackrell's illegal conduct was "purposeful or flagrant," see State v. Newland, 2010 UT App 380, ¶ 20, 253 P.3d 71-favors suppression in this case. I simply cannot agree with the majority opinion that "(there is no indication in the record that the officer stopped Strieff with the purpose of checking for outstanding warrants." See supra 126. To the contrary, Fackrell detained Strieff by retaining his identification while Fackrell called in a warrants check. Fackrell's intent in conducting this warrants check was, presumably, to determine if Strieff had any outstanding warrants. See generally State v. Sisneros, 631 P.2d 856, 859 (Utah 1981) ("[A] person is presumed to intend the natural and probable consequences of his acts." (internal quotation marks omitted)). Thus, regardless of Fackrell's motivation for initially approaching Strieff,[5] his detention of Strieff while conducting a warrants check was clearly purposeful behavior intended to discover the very warrant that led to Strieff's arrest and search.
[ 51 Further, " 'purpose and flagrancy' [is] the most significant factor in a suppression analysis because it 'directly relates to the deterrent value of suppression.'" Newland, 2010 UT App 380, ¶ 17, 253 P.3d 71. In Topanotes, the supreme court determined under similar cireumstances that "[alllowing the evidence in this situation would provide no deterrent at all to future unlawful detentions." See 2008 UT 30, ¶ 19, 76 P.3d 1159. The clear import of this statement, taken in context, is that suppressing the evidence would deter similar future police misconduct.[6] Given the direct relationship between deterrence and the purposefulness and fla-graney of police misconduct, the supreme court's holding that suppression would serve a deterrent purpose under these circumstances seems to me to be an implicit recognition that this type of police misconduct is purposeful or flagrant for purposes of an attenuation analysis and is therefore a proper subject for deterrence. See generally State v. Thurman, 846 P.2d 1256, 1263-64 ("{I)f the police had no 'purpose' in engaging in the misconduct suppression would have no deterrent value.").
T52 The majority opinion does reflect a great effort to draw some line protecting the public from purposeful or flagrant police abuse of warrants checks, and I applaud that effort. However, I cannot agree with the majority's conclusion that whether suppression is appropriate in any given cireumstance "depends upon the nature of the officer's intent and conduct in effecting the stop." See supra ¶ 33.[7] Warrants do not reveal themselves, and they are generally only discovered when the police affirmatively look for them. When such an intentional warrants check takes place during an illegal detention, it is inevitably the case, at least in my opinion, that the detention has been purposefully exploited to discover the warrant and that evidence discovered in a contemporaneous search incident to arrest on the warrant should be suppressed to deter such a practice.
In sum, I would conclude that all three of the attenuation factors weigh in favor of suppression in this case and I would reverse the district court and suppress the evidence found during the search incident to Strieffs arrest. I reach this conclusion in *339 the face of the many warrant-discovery cases from other jurisdictions, as cited in the majority opinion, that have decided to the contrary-not to mention the carefully constructed analysis of the majority opinion itself. Nevertheless, I just cannot get around the fact that the evidence in this case was discovered as a direct result of police misconduct and that, without suppression, there will be no deterrence of similar misconduct in future encounters between pedestrians and police.
154 Ultimately, I agree with the majority that the attenuation analysis in these cireum-stances involves a "balancing of the mutual concerns of discouraging police conduct that results in the illegal detention of a citizen, while recognizing the legitimate interest of the [State in enforcing outstanding arrest warrants." See State v. Frierson, 926 So.2d 1139, 1145-46 (Fla.2006) (Anstead, J., concurring). However, the State's primary and laudable interest in enforcing arrest warrants is to get those persons named therein into custody to answer for the charges underlying the warrants.[8] As to this primary interest, I see little room for balancing. Whenever an arrest warrant is discovered-however it is discovered-it is proper for police to arrest the person named in the warrant. See, e.g., United States v. Green, 111 F.3d 515, 521 (7th Cir.1997) ("It would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant-in a sense requiring an official call of 'Olly, Olly, Oxen Free' ").
1] 55 Many courts seem to end the attenuation analysis there, reasoning that because searches are allowed incident to arrest, then a valid arrest necessarily means a valid search. See, eg., id. ("Because the arrest is lawful, a search incident to the arrest is also lawful."). However, I am completely comfortable with decoupling the validity of the arrest from the admissibility of the resulting evidence for purposes of the Fourth Amendment analysis.[9] To me, the only question is whether suppression will reach back past the warrant to deter the police illegality that led to the warrant's discovery. In the instant case, suppression would give police an incentive to ensure that they have adequate grounds to stop citizens on the street and would ultimately deter similar illegal detentions. Under these cireumstances, I have little trouble in concluding that the balancing of interests shifts squarely in favor of suppression of the evidence,[10] while leaving the validity of the arrest based upon the warrant untouched.
T 56 In any event, I remain convinced that, for purposes of Utah law, my evaluation of the attenuation factors is supported by State v. Topanotes, 2003 UT 30, 76 P.3d 1159. I simply cannot read that case and surmise that the Utah Supreme Court would have allowed the evidence discovered in these circumstances if only the State had urged the attenuation doctrine instead of the "closely related" inevitable discovery doctrine. See United States v. Terzado-Madruga, 897 F.2d 1099, 1113 (11th Cir.1990). Unless and until the Utah Supreme Court revisits Topanotes, the nearly identical factual situations between that case and this one suggest that *340 Topanotes is extremely persuasive, if not binding, authority on the suppression issue in this case. Accordingly, I must dissent from the majority opinion, and I would reverse the district court's suppression ruling and Strieff's convictions below.

. The majority opinion states, "Even without reasonable, articulable suspicion, Officer Fackrell could legally have stopped Strieff and asked to see his identification, noted his name and date of birth, and then run a warrants check while Strieff remained free to leave." See supra 127. So long as such a ""stop" and request for identification was entirely voluntary on Strieff's part, I agree with the majority's statement. See generally State v. Hansen, 2002 UT 125, ¶ 34, 63 P.3d 650 (stating that there is no Fourth Amendment seizure when an encounter is consensual). Here, *336 however, even if Strieff had been free to ignore Officer Fackrell's questions and request for identification, Fackrell clearly detained Strieff for Fourth Amendment purposes when he conducted a warrants check while retaining Strieff's identification card. See generally Salt Lake City v. Ray, 2000 UT App 55, ¶ 17, 998 P.2d 274 ("Consequently, although Ray was not seized by Officer Eldard's original request for identification, this level one encounter escalated into a level two stop when Eldard retained Ray's identification while running the warrant check. During this time a reasonable person would not have felt free to leave.").

. The law surrounding level one consensual encounters assumes that a person retains the right to terminate the encounter and thereby end his or her contact with police. See Hansen, 2002 UT 125, ¶ 34, 63 P.3d 650 ("Avlevel one citizen encounter with a law enforcement official is a consensual encounter wherein a citizen voluntarily responds to non-coercive questioning by an officer. Since the encounter is consensual, and the person is free to leave at any point, there is no seizure within the meaning of the Fourth Amendment." (citation omitted)).

. State v. Newland, 2010 UT App 380, 253 P.3d 71, like many other Utah attenuation cases, arose in the context of consent to search given after an initial illegality. In my utilization of the quotation of Newland, I have altered the original word "consent" to reflect the circumstances of this case, the "discovery of a warrant." My choice of these words is deliberate and, I believe, appropriate, but it does have substantive implications , for the intervening circumstances determination-obviously, if the "discovery of a warrant" is the event that must be preceded by intervening circumstances, then that same discovery cannot itself be the intervening circumstance that satisfies the attenuation test. However, my formulation is consistent with Newland and Utah's other consent cases, which do not treat the consent as an intervening circumstance between the initial illegality and the ultimate search. Rather, those cases look for circumstances intervening between the illegality and the consent itself. See, eg., Hansen, 2002 UT 125, ¶ 68, 63 P.3d 650 ("Next, we consider whether there were any intervening factors between [the] misconduct and Hansen's consent that may have mitigated the illegality. Intervening circumstances may include such events as an officer telling a person he or she has the right to refuse consent or to consult with an attorney."); State v. Thurman, 846 P.2d 1256, 1274 (Utah 1993) (addressing consent obtained via a form that informed the defendant of his "constitutional right not to have a search made of the premises described below without a search warrant" and his "right to refuse to such a search"); Newland, 2010 UT App 380, ¶ 15, 253 P.3d 71 (discussing the types of circumstances that can intervene "between the misconduct and the ... consent" (omission in original) (internal quotation marks omitted)).

. There conceivably could be instances where a warrant would not have been discovered but for some police illegality and yet the resulting arrest is attenuated by intervening circumstances. Suppose, for example, that Officer Fackrell illegally detained Strieff for ten minutes of questioning but did not determine his identity or discover the warrant. Then suppose that, shortly thereafter, Strieff was waiting to cross a street and was recognized by a second officer who was driving by and was aware of Strieff's warrant. Strieff's release by Officer Fackrell and the happenstance of his subsequent encounter with the second officer would strike me as intervening circumstances between the illegal detention and the discovery of the warrant-even though, but for the illegal detention, Strieff would not have been waiting at that particular intersection when the *338 second officer drove by and recognized him as wanted on a warrant.

. Officer Fackrell initially stopped Strieff because Strieff had just left a suspected drug house. This suggests to me that Fackrell's stop of Strieff was motivated not only by a desire to learn more about the activities occurring at the house but also by a desire to investigate Strieff personally as a potential drug purchaser.

. I note that the warrants check in Topanotes was conducted "as part of 'routine procedure' or 'common practice.' '' See State v. Topanotes, 2003 UT 30, ¶ 2, 76 P.3d 1159.

. Indeed, such a standard seems to me to practically invite police officers to routinely make illegal stops and warrants checks so long as some other reason for the stop can be articulated. Under the majority's rule, the articulated reason need not satisfy the Fourth Amendment's requirements for a legal stop but must only establish some reason for the stop other than a bare desire to check for warrants. The ease with which this standard could be satisfied by all but the most unimaginative police officers would, as a practical matter, provide an incentive for police officers to make illegal stops and warrants checks as a matter of routine.

. By contrast, searches incident to arrest are fust that-incidental.

. In a sense, this situation is analogous to a double hearsay problem where an exception cures one instance of hearsay but not the other. Cf. State v. Schreuder, 726 P.2d 1215, 1231 n. 1 (Utah 1986) ("[DJouble hearsay is admissible if both aspects qualify under an exception to the hearsay rule...." (Stewart, J., concurring in result). Officer Fackrell could neither detain Strieff without reasonable suspicion nor arrest him without probable cause. The warrant cures any probable cause problem, but we are left with the illegal detention. As with double hearsay, I would not allow the evidence unless both impediments to admissibility are removed.

. I note that certain types of evidence-e.g., a defendant's DNA, scars, or tattoos-are permanent enough in nature that they could reasonably be expected to be discovered whenever the defendant would eventually be arrested on a warrant. Such evidence is therefore not the sole product of the illegal discovery of the warrant at a particular time and place because it would inevitably be discovered whenever the warrant was executed. Accordingly, I would likely not suppress such evidence, even when a defendant is arrested on a warrant discovered through an illegal detention. The drug evidence at issue in this case is not this type of evidence.