UNITED STATES of America,
Plaintiff–Appellee,

v.

Seedy Fehli ANALLA, Defendant–Appellant.

No. 91–5552.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1992.

Decided Sept. 11, 1992.

John Dewey Elliott, Columbia, S.C., argued for defendant-appellant.

Eric William Ruschky, Asst. U.S. Atty., Columbia, S.C., argued (E. Bart Daniel, U.S. Atty., on brief), for plaintiff-appellee.

Before WIDENER and LUTTIG, Circuit Judges, and BUTZNER, Senior Circuit Judge.

## OPINION

WIDENER, Circuit Judge:

Seedy Fehli Analla appeals his conviction for murder and related offenses. 18 U.S.C. §§ 1111, 113(a), 2112, 924(c). Analla also appeals his sentences, which include a sentence to life imprisonment without parole for the murder conviction. We affirm.

### I

Around midnight on May 4, 1989, someone robbed the Pizza Pub at Shaw Air Force Base in Sumter, South Carolina. The assailant carried a .25 caliber handgun. He shot one employee in the back of the head, killing her. He shot the other employee, Jeannette Delia, twice in the face. Mrs. Delia survived the shooting.

According to Mrs. Delia, the Pizza Pub closed at 11:00 pm on the night of the robbery. She and Luz Dougherty remained after closing to clean up and count the money. When counting the money, it was the practice to separate the $1.00 bills into bundles of 25 and to secure each bundle with a paperclip. Around 11:50 p.m., Analla came to the back door. He told Mrs. Delia that he was from Environmental Health and that he was concerned about a pile of garbage near the dumpster. He was wearing a black leather jacket with a badge. Mrs. Dougherty cleaned up the garbage as requested. The assailant wrote a report about the incident, but Mrs. Dougherty refused to sign it and wrote her own report instead. The assailant then acted as if he were going to do an inspection of the Pizza Pub. Mrs. Delia went with him to the bathrooms. While in the bathroom, the assailant stepped on a cockroach, which Mrs. Delia then put in the trash bag. Mrs. Delia took that trash bag to the kitchen and returned with a clean one. When she returned to the bathroom, the assailant pointed out a piece of toilet paper on the floor in one of the stalls. Mrs. Delia stooped down, grabbed the toilet paper and flushed it down the toilet. The assailant shot her twice in the face and apparently left the bathroom.

Mrs. Delia crawled out of the bathroom window and went across the street to the Security Police station. When the Security Police arrived at the Pizza Pub, they found the back door unlocked. Mrs. Dougherty's body was inside. She had been shot in the back of the head.

On the night of the murder, Analla was registered at the Carolina Pines motel, about one-half mile from the Pizza Pub. The morning after the murder, Analla checked out of the Carolina Pines at 8:42 a.m. Analla drove to a convenience store called the Pantry, where he bought some gum and got 20 dollars in quarters. He then used the pay phone outside the Pantry to call his wife, Alexandra, who was in Greece.

While Analla was using the pay phone outside, Marjorie Brannon, the training manager at the Pantry, received a call on the phone inside the store. The caller mentioned the incident at the Pizza Pub and described the suspect. Although the record does not say how the caller described the suspect, the police were looking for an Hispanic male wearing a black leather jacket. Miss Brannon felt that Analla fit the description, so she asked her supervisor to call the police. Analla is not Hispanic, but he is Moroccan, and was described by Officer Parker on his arrival as "Hispanic-type

looking." The record shows that a black leather jacket was later found in Analla's car. The call to the police advised them that a man fitting the Pizza Pub murderer's description was in the pay telephone booth outside the Pantry.

Two Sumter Police Department squad cars, driven by officers Parker and McCoy, responded to the call. Parker and McCoy parked their cars on either side of Analla's car at 45 degree angles to it, with McCoy's car on the driver's side of Analla's car and Parker's car on the passenger side. Analla's car was not blocked in by the squad cars.

Officer Parker approached Analla, who was still using the phone. Parker told Analla that he wanted to speak to him when he was through. Parker asked for his license and registration. Analla went to his car to get the license. Analla had a Georgia driver's license, but the car was registered in Texas to William Analla, who, Analla explained, was his brother-in-law. After getting the license from his car, Analla says he left the driver side door ajar.

Parker and McCoy stood between Analla's car and Parker's squad car while Parker used his walkie-talkie to check the license with the dispatcher. Parker testified that he would have stopped Analla had Analla attempted to drive off without his license. Parker maintained, however, that if Analla had asked to have his license returned, he would have asked Analla to "hold on for just a minute to verify the fact that it is a clear license," but would have had no choice but to return the license and permit Analla to go if Analla had persisted.

While Parker was checking Analla's license, a third officer, Sergeant Moore, arrived at the Pantry. Sergeant Moore approached Analla. Parker and McCoy still stood between Analla's car and Parker's patrol car, behind Moore. Moore told Analla that there had been a murder at Shaw Air Force Base and that Analla fit the description. Moore asked whether Analla had a weapon. Analla said no. Moore asked Analla for permission to search the car. Analla said "Go ahead." Before

starting the search, Moore again asked Analla for permission to search and Analla again consented. At some point before beginning his actual search of the car, Analla testified that he saw Moore looking into the car through the open passenger door. It is not clear from Analla, however, whether this occurred before or after Analla first consented to the search. At no time did any of the officers tell Analla that he had a right to leave, to refuse to answer any questions, or to refuse the search.

The search of Analla's car revealed a .25 caliber pistol under the driver's seat. A crime lab later identified the pistol as the murder weapon. Upon finding the gun, Parker and McCoy immediately handcuffed Analla and placed him under arrest for violating a South Carolina law that requires handguns to be kept either in the glove compartment or in the trunk. Officer Parker put Analla in his squad car and advised him of his Miranda rights. After some conversation following Analla's arrest, Parker concluded from Analla's skin tone that Analla was not Hispanic.

Shortly thereafter, two FBI agents, Oyler and Younginer, arrived on the scene. They were told that the Sumter Police were holding a person who fit the description of the Pizza Pub homicide suspect. Agent Younginer again read the Miranda warnings to Analla and asked Analla if he would mind talking with them. Analla said that he did not mind. Younginer also obtained Analla's written consent to search the car.

Officer Parker and a Sumter Police evidence technician then inventoried the contents of the car. Incriminating evidence found in the car included: the .25 caliber semi-automatic pistol found under the driver's seat; cash, including two bundles of 25 $1.00 bills paperclipped together; and a black leather jacket.

Because of the confusion at the scene, the FBI agents decided to interrogate Analla elsewhere. They took him to the Sumter Police station for that purpose. No questioning occurred during the trip to the station house. At the station, the agents and Analla reviewed a form containing an advice of rights and waiver of rights. Analla

signed the waiver. Analla was interviewed for about two hours, but never confessed to the crime. However, inculpatory statements obtained from the interrogation were admitted at trial. After the interrogation, Analla was booked and swabs of his hands were taken in order to test for gunshot residue. These tests later revealed that Analla recently had fired a firearm or had been close to one when it was fired, and were admitted at trial.

A suppression hearing was held at which Analla testified. At the time of the arrest, Analla was 24 years old. He was born and lived in Morocco until the age of 16. At that time, he was adopted by his brother-in-law, who was in the U.S. Air Force, and his sister so that he could attend schools for the children of U.S. military personnel. Analla attended school in Morocco, Germany, England, and the United States. He was graduated from high school in 1985 and attended at least one semester at Louisiana Tech. Although he was a native of Morocco, Analla's understanding of the English language was not an issue, and the district court so found at the suppression hearing.

Analla testified that he was scared of the police because of his childhood in Morocco. He testified that Moroccan police notoriously use torture and that he feared being tortured or shot should he refuse to answer any question asked, refuse to allow the search of his car, or try to leave the scene at any point, even at the earliest stages of his encounter with officers Parker and McCoy. He conceded, however, that the officers and agents never said or did anything suggesting torture. Instead, Analla claimed that he was intimidated by their tone of voice.

The defense moved to suppress both the fruits of the search and the statements made during the interrogation. This motion was denied. The district court found the search to be a valid consensual search. The court found no evidence in the record that the police in any way threatened Analla with physical force or abuse or in any way implied that they would use force should Analla refuse to allow the search.

The court also found that, in spite of his Moroccan origin, "[g]iven the characteristics of the accused, of his age, his experience, his education, and his demonstrated maturity and intelligence, I find it hard to believe that the defendant was ... intimidated to such an extent by what was taking place that he was afraid" to ask to leave the scene or to refuse the search.

With regard to the interrogation, the district court found that Analla's statements were "clearly voluntary" under the totality of the circumstances. The court found that Analla had been advised at least twice of his Miranda rights prior to the interrogation, that, based on Analla's demeanor and testimony at the hearing, there was "no reason ... to conclude that [he] did not understand the very simple and clear wording of the Miranda Rights," and that there was nothing in the record to indicate that the interrogating officers "in any way threatened the defendant, harassed him, coerced him, or placed him under any duress, expressed or implied, to the extent that his voluntariness was destroyed."

Defendant was tried before a jury and convicted of murder, assault with intent to kill, armed robbery, and use of a firearm in the commission of a felony. 18 U.S.C. §§ 1111, 113(a), 2112, 924(c). During the trial, photographs of the surviving victim's gunshot wounds to the face and of the deceased victim lying in a pool of blood were admitted over the defendant's objection. Analla was sentenced to life imprisonment for the murder count, 20 years concurrent for the assault count and 15 years concurrent for the armed robbery count. The defendant also received a five year consecutive sentence on the firearm count. Analla now appeals his conviction and sentence.

II

▇ We first address Analla's argument that the search of his car violated his fourth amendment rights because it was neither consensual nor based on the requisite level of objective justification. Analla makes two interrelated arguments on this point. First, he argues that he was unlaw-

**124**

fully seized at the time of the search, and, therefore, that the search was not a valid consensual search. Second, Analla argues that, based on the totality of the circumstances of his encounter with police at the Pantry, his consent to search was not voluntary. We review both questions to determine whether the district court's findings are clearly erroneous. *United States v. Gordon*, 895 F.2d 932 (4th Cir.1990), cert. denied, —— U.S. ——, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990); *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982). Neither argument merits reversal.

■ All contact between police and citizens does not amount to a seizure. Rather, what starts as a consensual encounter between police and citizen becomes a seizure within the meaning of the fourth amendment only when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984), *quoting United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).[1] We emphasized in *United States v. Gordon*, *supra* 895 F.2d at 938, that the free-to-leave standard is an objective test, not a subjective one. The inquiry is whether a reasonable person under the circumstances would have believed that he was not free to leave. In *Gordon*, we rejected a defendant's argument that "the fact that his father was a former police officer who taught him to respect and obey law enforcement personnel demonstrate[d] that he believed that he was not free to leave." *Gordon*, 895 F.2d at 937–38. We, therefore, find no merit to Analla's contention that he was seized because he thought, based on his experience with Moroccan police, that he would be restrained or even tortured should he try to leave.

We also find, based on a review of the record, that the district court did not err in finding that Analla was not seized at the time that he gave consent to search his car.

■ Specifically, the Court has held that "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Delgado*, 466 U.S. at 216, 104 S.Ct. at 1762. Only when the circumstances of the encounter "become so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave" if he does not respond does the encounter become a seizure. *Delgado*, 466 U.S. at 216, 104 S.Ct. at 1763. It is also clear that the encounter does not become a seizure merely because the officers do not tell the defendant that he is free to leave or to refuse to comply with their requests. *See Delgado*, 466 U.S. at 216, 104 S.Ct. at 1762–63. *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 231–34, 93 S.Ct. 2041, 2049–51, 36 L.Ed.2d 854 (1973) (applying this principle to a consensual search).

■ When officer Parker approached Analla and asked to see his license and registration, Analla was not seized. Analla's cooperation with Parker did not convert the encounter into a seizure, even though Parker did not tell Analla that he was free to leave or to refuse the request. Although Parker was accompanied by officer McCoy, neither had his gun drawn. There is no evidence of any use or threat of physical force, and, although Analla claims that the officers' tone of voice was intimidating, the district court found to the contrary. Parker necessarily had to keep Analla's license and registration for a short time in order to check it with the dispatcher. However, he did not take the license into his squad car, but instead stood beside the car, near where Analla was standing, and used his walkie-talkie. Analla was free at this point to request that his license and registration be returned and to leave the scene.

Analla urges that the following testimony by officer Moore suggests that Moore made Analla's freedom to leave conditional on his consent to the search:

Q: Did you promise him anything if he would let you search the car?

1. See, however, the discussion in *Gooding*, 695 F.2d at 81, n. 4.

A: No, sir. I did tell him that I would like to search the car when everything cleared up.

Court: Search the car what?

A: Go ahead and clear the situation up.

Because this argument was not made at the suppression hearing, the district court did not make explicit findings as to whether the statement would have implied to a reasonable person that he was not free to leave. A negative answer to this question clearly is implicit in the district court's other findings, however. We are of opinion that, based on the totality of the circumstances, as evidenced by the entire record rather than an isolated piece of testimony, a finding that the appellant was not seized in spite of this testimony is not clearly erroneous. This argument, therefore, does not merit a reversal of the district court's decision not to suppress the fruits of the search.

■ In arguing that Analla's consent to search was not voluntary, appellant again stresses the above-quoted statement by officer Moore. Whether a defendant's consent to search is voluntary is a factual question determined in light of the totality of the circumstances and must be upheld unless clearly erroneous. *United States v. Gordon,* 895 F.2d 932, 938 (4th Cir.), cert. denied, — U.S. —, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990).

Analla argues that officer Moore's statement, if an accurate representation of what he actually said to Analla when he asked for permission to search, would suggest to a reasonable person that he would not be allowed to leave unless he gave consent to the search. *Cf. Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968) (grandmother of accused did not consent to the search, but rather merely acquiesced to a claim of lawful authority because the police told her that they had a search warrant for the premises). When viewed in combination with the failure to tell Analla that he had the right to refuse to consent to the search and the threatening presence of three uniformed officers and three patrol cars, Analla argues that officer Moore's statement

shows that his consent was not voluntarily given.

Based on a review of the record, we cannot say that the district court's finding that the consent to search was given voluntarily is clearly erroneous. Analla was 24 years old at the time of the arrest. He had been graduated from high school and had attended some college. After observing Analla's responses at the hearing, the district court found that Analla appeared intelligent, articulated his views and positions well, and responded intelligently and comprehensively to questions asked of him during the hearing. The encounter with police lasted only a brief time prior to the search. There was no evidence that any force was used or threatened in any way. Officer Moore's recollection of what he said to Analla, even if accurate, did not amount to a claim of lawful authority to search Analla's car. As indicated above, the absence of an explicit finding with regard to this statement by officer Moore is understandable in light of Analla's failure to argue the point at the suppression hearing.

### III

Analla next contends that statements he made during the FBI interrogation following his arrest and the gunpowder residue tests, also made while he was in police custody after his arrest, should have been suppressed as fruits of his illegal arrest. Because we find that the search of his car was lawful, we find that his subsequent arrest also was lawful. This argument, therefore, provides no basis for reversal.

### IV

■ The trial court admitted two photographs of Mrs. Delia' face showing the two gunshot wounds that she sustained in the robbery and a photograph of the murdered victim, Mrs. Dougherty, lying in a pool of blood. Analla objected to the admission of these photographs on the grounds that their prejudicial effect would outweigh their probative value, if any. *See* Fed. R.Evid. 403. Appellant now argues that their admission was reversible error.

■ The district court's admission of these pictures cannot be disturbed absent a clear abuse of discretion. *United States v. Whitfield*, 715 F.2d 145 (4th Cir.1983). *See also United States v. Melton*, 970 F.2d 1328, 1336 (4th Cir.1992) ("The balancing of the probative value against the potential prejudice of evidence is entrusted to the sound discretion of the trial court, and its appraisal, absent extraordinary circumstances, will not be disturbed on appeal."). The district court admitted the photographs of Mrs. Delia's face with the following comments:

> Well, count 4 of the indictment charges him carrying a firearm in commission of a crime of violence. I think this certainly goes to show a crime of violence. I think it's relevant to show the injuries that she sustained the left temple and right temple. I'm going to let them in, over your objection.

The photograph of Mrs. Dougherty was introduced to show the position of the body and thus to corroborate the testimony of Mrs. Delia. The district court excluded all of the other photographs of Mrs. Dougherty, admitting only the one that showed the least amount of blood. We cannot say that the district court abused its discretion in admitting the photographs.

## V

Next, appellant attacks his sentence to life without parole for first degree murder under 18 U.S.C. § 1111. He makes two arguments.

■ First, Analla argues that the Sentencing Reform Act of 1984 does not abolish parole for a sentence of life imprisonment under § 1111. We disagree.

Section 1111 provides that "[w]hoever is guilty of murder in the first degree ... shall be sentenced to imprisonment for life." 18 U.S.C. § 1111(b) [2]. Prior to the Sentencing Reform Act, two sections provided the possibility of parole for those sentenced to life under § 1111(b). *See generally United States v. LaFleur*, 952 F.2d 1537, 1544–45 (9th Cir.1991) (holding that after the effective date of the Sentencing

Reform Act a life sentence without parole is the minimum sentence for first degree murder under § 1111). The first, 18 U.S.C. § 4206(d) provided:

> Any prisoner, serving a sentence of five years or longer, who is not earlier released under this section or any other applicable provision of law, *shall be released on parole* after having served two-thirds of each consecutive term or terms, or *after serving thirty years of each consecutive term or terms of more than forty-five years including any life term*, whichever is earlier: Provided, however, That the Commission shall not release such prisoner if it determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime. (Emphasis added).

The second, 18 U.S.C. § 4205(a), provided:

> Whenever confined and serving a definite term or terms of more than one year, *a prisoner shall be eligible for release on parole* after serving one-third of such term or terms or *after serving ten years of a life sentence* or of a sentence of over thirty years, except to the extent otherwise provided by law. (Emphasis added).

The Sentencing Reform Act of 1984 repealed both of these sections. *See* Pub.L. 98–473 §§ 218(a)(5), 235, 98 Stat. 2027, 2031.

Analla argues that the Sentencing Reform Act should not be interpreted to have abolished parole for those sentenced to life imprisonment because neither the Act nor the legislative history, *see* 1984 U.S.Code Cong. & Admin.News 3182, 3220 *et seq.*, specifically expresses the intent to abolish parole for life sentences. This argument misses the mark. Section 1111 itself does not provide for parole. It is only through sections 4205(a) and 4206(d) that a person sentenced to life imprisonment ever would have been eligible for parole. Both of these sections expressly refer to parole for a prisoner serving a life sentence and were

---

**2.** There is no issue in the case with respect to    the death penalty.

in Chapter 311, U.S.Code. Section 218(a) of the repealer, 98 Stat. 2027, provides in part: "The following sections of the U.S.Code are repealed: ... (4) Chapter 311...." Congress could not have expressed its intent to abolish parole for life sentences any more clearly than by repealing the very sections that provided parole for the same.

■ Analla also argues that he was denied his Fifth Amendment right to equal protection because 21 U.S.C. § 848(e) provides a minimum sentence of 20 years while 18 U.S.C. § 1111 provides a minimum sentence of life in prison. These two sections provide different penalties for different crimes. Section 848(e) punishes intentional murder in furtherance of a continuing criminal enterprise. Section 1111 punishes murder within the special maritime or territorial jurisdiction of the United States. There is simply no unequal treatment here that would even trigger an equal protection analysis. Anyone who violates section 848(e) is eligible for one sentence and anyone who violates section 1111 is eligible for a different sentence. The comparison of these two sections presents no more of an equal protection problem than would a comparison of the punishment for any other two different crimes. Congress is not bound to provide the same punishment for every unlawful homicide. *See generally LaFleur, supra,* 952 F.2d at 1547–48 (rejecting a claim that the difference in minimum sentences provided by §§ 1111 and 848(e) violates equal protection by finding a rational basis for any unequal treatment and no suspect class requiring any higher level of scrutiny). Accordingly, we find no violation of equal protection.

## VI

■ As a final matter, Analla argues that his sentences for the robbery count and the assault with intent to kill count were erroneous. He argues that the district court erred in sentencing him to the statutory maximum penalties for robbery and assault because such a sentence amounted to an upward departure from the Sentencing Guidelines without prior notice or a statement of reasons for the departure. We disagree because we find that the district court did not depart from the sentencing guidelines.

In the instant case, Analla was found guilty of first degree murder (Count 1), assault with intent to murder (Count 2), robbery (Count 3), and use of a firearm in the commission of a felony (Count 4). Only the first three counts are relevant here. U.S.S.G. § 3D1.1(b). The district court assigned adjusted offense levels to the first three counts as follows: Count 1 = 43; Count 2 = 28; Count 3 = 24. The district court then applied the multiple count rules from U.S.S.G. § 3D1.1 and assigned a total offense level of 43 to these three counts. The procedure for determining the specific sentence to be imposed on each of the counts in a multiple-count case is governed by U.S.S.G. § 5G1.2, which provides:

(a) The sentence to be imposed on a count for which the statute mandates a consecutive sentence shall be determined and imposed independently.

(b) Except as otherwise required by law (*see* § 5G1.1(a), (b)), the sentence imposed on each other count shall be the total punishment as determined in accordance with Part D of Chapter Three, and Part C of this Chapter.

(c) If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.

(d) If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects sentences on all counts shall run concurrently, except to the extent otherwise required by law.

The Commentary to this section provides in relevant part:

Usually, at least one of the counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count. *The sentence on each of the other counts will then be set at the lesser of the total punishment and the applicable statutory maximum, and be made to run concurrently with all or part of the longest sentence.*

U.S.S.G. comment to § 5G1.2. (emphasis added)

In this case, the total punishment as determined by the adjusted combined offense level was life imprisonment. According to section 5G1.2(b), the sentence on the other counts, robbery and assault, would be life imprisonment, except as otherwise required by law. Section 5G1.1(a) provides that: "[i]f the application of the guidelines results in a sentence above the maximum authorized by statute for the offense of conviction, the statutory maximum shall be the guideline sentence." Because life imprisonment exceeds the statutory maximum for both robbery and assault, the district court was correct in sentencing Analla to the statutory maximum for these two counts. Because the maximum allowable sentence for the murder count is adequate to achieve the total punishment of life imprisonment, section 5G1.2(c) provides that the sentences on the murder, robbery and assault counts are to run concurrently. The district court therefore did not err in imposing concurrent sentences of the statutory maximum for the robbery count and the assault count.

The judgment of conviction and the sentence imposed are accordingly

AFFIRMED.