2007 UT App 117

STATE of Utah, Plaintiff and Appellee,

v.

Marcus Barry ADAMS, Defendant and Appellant.

No. 20050493–CA.

Court of Appeals of Utah.

April 12, 2007.

Margaret P. Lindsay, Orem, for Appellant.

Mark L. Shurtleff, atty. gen., and Marian Decker, asst. atty. gen., Salt Lake City, for Appellee.

Before Judges DAVIS, McHUGH, and ORME.

## OPINION

McHUGH, Judge:

¶ 1 Marcus Barry Adams appeals the trial court's denial of his motion to suppress evidence obtained during a search of his person. We affirm.

## BACKGROUND

¶ 2 "Because the legal analysis of a search and seizure case is highly fact dependant, we recite the facts in detail." *State v. Hansen,* 2002 UT 125, ¶ 5, 63 P.3d 650 (quotations omitted).[1] Around 10:00 p.m. on May 1, 2003, Officer Robert Patrick spotted Adams standing alone in front of a closed business. Patrick, who was in uniform, shone a spotlight on Adams while approaching him but then turned it off. Patrick did not activate the flashing lights on his vehicle. Patrick approached Adams because there had been recent burglaries in the area, and he wanted to find out what Adams was doing.

¶ 3 Upon being approached by Patrick, Adams explained that he lived in a studio apartment above the business and that he was outside having a cigarette because he was not allowed to smoke in his apartment. Patrick noticed that Adams had a backpack and a large soft drink with him and asked Adams why he would have those items if he planned to be outside his apartment for just a few minutes. Adams replied that he had just returned from visiting a friend and stopped to smoke before going upstairs to his apartment.

¶ 4 Patrick asked Adams for identification and used it to run a warrants check. Patrick held onto the identification for the duration of the warrants check, which took approximately thirty to sixty seconds. Patrick used the portable radio that was attached to his shoulder to contact dispatch and conduct the warrants check. The check revealed that Adams had no outstanding warrants. After returning Adams's identification, Patrick continued to question Adams, asking first if the backpack contained anything illegal or stolen. Adams responded that it did not. Patrick then asked for permission to search the back-

1. We recite the facts as they were found by the     district court.

pack; Adams consented. The search of the backpack revealed nothing illegal or suspicious, but it did yield a bottle of eye drops, which Patrick testified is typically used by drug users to reduce the redness in their eyes.

¶ 5 Patrick then asked if Adams had any illegal drugs with him, and Adams said no. Patrick asked to search Adams's person for drugs or other contraband, and Adams consented.[2] During the search of Adams's person, Patrick discovered a pipe containing partially burnt marijuana. Adams initially attempted to move the pipe to his back pocket, but later gave it to Patrick. Patrick then asked Adams if he had any additional marijuana on his person, and Adams produced two bags of marijuana from his jacket.

¶ 6 Adams pleaded guilty to one count of possession or use of marijuana in a drug-free zone with a prior conviction, a third-degree felony, in violation of Utah Code section 58–37–8(2)(a)(i). *See* Utah Code Ann. § 58–37–8(2)(a)(i) (Supp.2005). After the district court denied Adams's motion to suppress, Adams entered a conditional guilty plea, reserving the right to appeal the denial of the motion to suppress. Adams now appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 7 Adams argues that the district court erred by denying his motion to suppress. We review a ruling on a motion to suppress for correctness, without deference to the district court's application of the law to the facts. *See State v. Brake,* 2004 UT 95, ¶ 15, 103 P.3d 699.

## ANALYSIS

¶ 8 Adams contends that his encounter with Patrick was an illegal seizure because Patrick did not have an articulable suspicion that Adams had committed or was about to commit a crime. More specifically, Adams asserts that the police stop was not, as the State contends, a consensual encounter because once Patrick began running a warrants check Adams was not free to leave. Adams also argues that Patrick obtained consent to search the backpack and his person through the exploitation of a prior illegality. We disagree.

¶ 9 The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Constitution does not forbid all searches and seizures, only unreasonable ones. *See State v. Lafond,* 2003 UT App 101, ¶ 11, 68 P.3d 1043 (citing *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Under Utah law, there are three permissible levels of police stops:

> (1) An officer may approach a citizen at any time and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an articulable suspicion that the person has committed or is about to commit a crime . . . ; [and](3) an officer may arrest a suspect if the officer has probable cause to believe an offense had been committed or is being committed.

*State v. Markland,* 2005 UT 26, ¶ 10 n. 1, 112 P.3d 507 (alteration in original) (quotations omitted).

¶ 10 A level one encounter is a voluntary encounter during which a citizen may choose to answer a police officer's questions but is free to leave at any time during the questioning. *See Salt Lake City v. Ray,* 2000 UT App 55, ¶ 11, 998 P.2d 274. " 'As long as the person remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.' " *Id.* (quoting *State v. Jackson,* 805 P.2d 765, 767 (Utah Ct.App.1990)). In contrast, a person is seized in a level two stop, and thus afforded the protections of the Fourth

---

**2.** Adams testified that Patrick did not ask permission to search Adams's person and that he did not consent to the search. The district court found Patrick's testimony that he obtained consent to be "more credible," concluding that "it only seems logical that, having requested and received permission to search the backpack, the officer would have asked once again for permission to search the defendant's person." Adams does not challenge that finding on appeal. Further, Adams admits that he consented to the search of the backpack.

Amendment, when "the officer, by means of physical force or show of authority has in some way restrained the liberty of [the] person." *Id.* (quotations omitted). A level one encounter becomes a level two stop when "a reasonable person, in view of all the circumstances, would believe he or she is not free to leave. This is true even if the purpose of the stop is limited and the resulting detention brief." *Id.* (citation and quotations omitted). Circumstances demonstrating that a level two stop is under way include the presence of more than one officer, the display of an officer's weapon, physical touching of the person, or use of commanding language or tone of voice. *See id.*

### I.  The Warrants Check

■  ¶ 11 Considering the totality of the circumstances surrounding the initial encounter between Patrick and Adams, starting with Patrick's approach and ending with the successful completion of the warrants check, we conclude that Adams was subject to a level one encounter, and therefore, Patrick did not need an articulable suspicion to question Adams. We reach this conclusion despite Patrick's perusal of Adams's license for thirty to sixty seconds to run a warrants check. In *Salt Lake City v. Ray*, 2000 UT App 55, 998 P.2d 274, this court noted that "[g]enerally, when a person's identification or other important papers are taken by a law enforcement officer, a reasonable person would not feel free to leave." *Id.* at ¶ 14. In *Ray*, however, a police officer retained the defendant's identification while he stepped away to his patrol car to perform a warrants check, which lasted approximately five minutes. *See id.* at ¶ 5. During the warrants check, another police officer continued the questioning and obtained consent to search the defendant's handbag, in which he found drug paraphernalia. *See id.* at ¶ 13. Despite our conclusion in *Ray*, that an illegal seizure had occurred, we noted that "[a] warrant[s] check *will not per se escalate* [an] encounter into a level two stop." *Id.* at ¶ 13 n. 2 (emphasis added). The facts of this case are, indeed, an example of "the situation where an officer views the identification, obtains the desired information, and promptly returns

it," that prevented this court from adopting a per se rule in *Ray*. *Id.*

¶ 12 Unlike *Ray*, Patrick did not step away from Adams as he conducted the warrants check. Rather, he stood near Adams and performed the check by contacting dispatch with a radio that he carried on his shoulder. And Patrick returned Adams's identification before continuing the questioning or asking for Adams's consent to search his backpack or his person. Such was not the case in *Ray*. *See id.* at ¶ 20 (noting that the defendant consented to the search while an officer held her identification during the warrants check). Moreover, while the warrants check in *Ray* took at least five minutes, *see id.* at ¶ 5, Patrick held Adams's identification for only thirty to sixty seconds.

¶ 13 The present case is similar to *United States v. Analla*, 975 F.2d 119 (4th Cir.1992), in which the Fourth Circuit held that a defendant was not seized for purposes of the Fourth Amendment where the investigating officer did not take the license over to the squad car to run the warrants check. *See id.* at 124. Instead, the officer "stood beside the car, near where [the defendant] was standing, and used his walkie-talkie" to contact the dispatcher. *Id.* This circumstance, among others, resulted in the determination that the consensual encounter did not escalate into a level two seizure. *See id.* Thus, in this case, Patrick's momentary use of Adams's identification for a warrants check does not compel the conclusion that a level two seizure occurred, especially because Patrick did not hold onto the identification any longer than was necessary. *Cf. Florida v. Royer*, 460 U.S. 491, 501–02, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (holding that police acted permissibly in approaching airline traveler and asking for identification, but when police retained traveler's documentation while asking him to accompany them to a separate room for questioning, police illegally seized traveler); *People v. Jackson*, 39 P.3d 1174, 1188 (Colo.2002) (collecting cases and noting that numerous federal and state courts have recognized that "whether an officer *retains* a defendant's identification is a critical factor in distinguishing, under the totality of the circumstances, a consensual

encounter from an investigatory stop" (emphasis added)).

¶ 14 The other circumstances present during the initial encounter between Patrick and Adams likewise do not favor characterizing the encounter as a level two stop. Unlike *Ray*, only one officer was involved in the encounter with Adams. Also, although Patrick was armed at the time he questioned Adams, he used no show of force such as drawing his weapon or flashing his police lights. He also did not speak to Adams in a commanding tone or with authoritative language. In fact, Adams testified: "[Patrick] was pretty much straight up nice with me. We had no confrontations."

## II. The Search of Adams's Backpack and Person

¶ 15 Adams further argues that his consent was not voluntary because it was obtained through the exploitation of a prior illegality.[3] The district court concluded that once the warrants check was successfully concluded, the next phase of the exchange, starting with the successful completion of the warrants check and ending with the arrest, escalated to a level two encounter when Patrick asked for and received permission to search Adams's backpack. The district court found that Adams consented to the search of the backpack and the subsequent search of his person, thereby obviating the need for Patrick to form an articulable suspicion that Adams had committed or was about to commit a crime. Because we agree with the district court that the initial exchange between Patrick and Adams never escalated to a level two encounter, there was no prior illegality that could have been exploited to support Adams's argument that his consent to search his backpack was anything other than voluntary. Similarly, because the search of the backpack was conducted pursuant to Adams's voluntary consent, there is no prior illegality that could have been exploited to obtain his further consent to the search of his person. Consequently, we reject Adams's argument that his consent was not voluntary.

## CONCLUSION

¶ 16 The initial encounter between Patrick and Adams was a consensual level one encounter. Furthermore, Adams's consent to the search of his backpack and person was not obtained as the result of the exploitation of a prior illegality because the encounter did not escalate into a level two stop requiring articulable suspicion. Therefore, the district court did not err in declining to suppress the evidence discovered during that search.

¶ 17 Affirmed.

¶ 18 I CONCUR: JAMES Z. DAVIS, Judge.

ORME, Judge (dissenting):

¶ 19 If football is a game of inches, Fourth Amendment jurisprudence can be a matter of seconds. The majority acknowledges as much with its recognition that "[a] level one encounter becomes a level two stop when 'a reasonable person, in view of all the circumstances, would believe he or she is not free to leave. This is true even if the purpose of the stop is limited and the resulting detention brief.'" Lead opinion ¶ 10 (quoting *Salt Lake City v. Ray*, 2000 UT App 55, ¶ 11, 998 P.2d 274). The majority also recognizes, as it must given *Ray*, that "'when a person's identification or other important papers are taken by a law enforcement officer, a reasonable person would not feel free to leave.'" Lead opinion ¶ 11 (quoting *Ray*, 2000 UT App 55 at ¶ 14, 998 P.2d 274). This is exactly the position Adams was in for the minute or so that Officer Patrick held his identification card.

¶ 20 While I agree with *Ray* that running a warrants check "will not per se escalate [an] encounter into a level two stop," *Ray*, 2000 UT App 55 at ¶ 13 n. 2, 998 P.2d 274, holding an individual's identification card longer than is necessary to obtain the information needed to run a warrants check will. *See, e.g., Unit-*

---

**3.** The focus of an "exploitation analysis" is to evaluate "the relationship between official misconduct and subsequently discovered evidence to determine if excluding the evidence will deter future illegalities." *State v. Hansen*, 2002 UT 125, ¶ 62, 63 P.3d 650. In the absence of official misconduct, suppression of the evidence cannot serve to deter future illegal conduct.

ed States v. Johnson, 326 F.3d 1018, 1022 (8th Cir.2003) (stating suspect was seized when, inter alia, police officers "took possession of his personal property—here, his driver's license"), cert. denied, 540 U.S. 962, 124 S.Ct. 425, 157 L.Ed.2d 304 (2003); United States v. Lambert, 46 F.3d 1064, 1068 (10th Cir.1995) ("[W]hen law enforcement officials retain an individual's driver's license in the course of questioning him, that individual, as a general rule, will not reasonably feel free to terminate the encounter."); State v. Painter, 296 Or. 422, 676 P.2d 309, 311 (1984) (holding seizure occurred when police officer retained driver's license while making radio warrants check); State v. Daniel, 12 S.W.3d 420, 427 (Tenn.2000) (emphasizing that "one circumstance [in the case before it] reflect[ed] a distinct departure from the typical consensual encounter—[the] Officer['s] ... retention of [the defendant's] identification to run a computer warrants check[,]" which "effectively immobilized" the defendant and was thus "a seizure"). See also People v. Jackson, 39 P.3d 1174, 1189 (Colo.2002) ("The need for identification is pervasive in today's society, and a reasonable person would not consider abandoning his identification a practical option.").

¶ 21 The flaw in the majority's logic is that it assumes a warrants check cannot be run unless the officer retains physical possession of the identification card while the warrants check is in process. Thus, the majority is able to say that "Patrick held onto the identification for the duration of the warrants check, which took approximately thirty to sixty seconds[,]" Lead opinion ¶ 4, and conclude that this is the very situation contemplated in Ray, " 'where an officer views the identification, obtains the desired information, and promptly returns it[.]' " Lead opinion ¶ 11 (quoting Ray, 2000 UT App 55 at ¶ 13 n. 2, 998 P.2d 274). See also Lead opinion ¶ 13 (claiming the officer in this case "did not hold onto the identification any longer than was necessary"). The majority apparently takes the view that "the desired information" referred to in Ray is the information learned as a result of the warrants check rather than the minimal information needed to initiate one.

¶ 22 I disagree. I believe that the "desired information" to be gleaned from "view[ing] the identification," Ray, 2000 UT App 55 at ¶ 13 n. 2, 998 P.2d 274, is simply the name and date of birth of the individual on whom the warrants check is to be run. After that information has been mentally noted, or even read to dispatch in the case of a long name with unusual spelling, the identification can be "promptly return[ed]," id., i.e., returned within 4 or 5 seconds, while the officer awaits the result of the warrants check on his own time, as it were. The immediate return of the identification card to the individual, even as the officer continues to await word from dispatch, unambiguously signals the individual that he is free to go and is under no obligation to wait with the officer to learn the result of the warrants check. Cf. United States v. Soto–Lopez, 995 F.2d 694, 698 (7th Cir.1993) (holding no seizure occurred when law enforcement officers "returned the [plane] ticket and identification immediately after looking at them").

¶ 23 By holding Adams's identification throughout the pendency of the warrants check rather than immediately returning it to him, Officer Patrick held it for 25 to 55 seconds longer than was necessary. During that time, Adams would not have felt free to leave, escalating the encounter to a level two seizure, albeit one of brief duration, for which there simply was no legal justification, i.e., no articulable suspicion of criminality. Accordingly, I would reverse the trial court's determination that the encounter did not escalate to a level two seizure until the backpack was searched, hold that an unwarranted level two seizure occurred when the officer retained Adams's identification card while awaiting the outcome of the already initiated warrants check, and proceed to consider whether that illegality was exploited in securing Adams's consent to the search of his backpack.