**2021 UT App 56**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TU FAN BUI-CORNETHAN,
Appellant.

Opinion
No. 20190208-CA
Filed May 27, 2021

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 181905704

Lori J. Seppi and Brady Smith, Attorneys
for Appellant

Sean D. Reyes and Nathan Jack, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
GREGORY K. ORME and DAVID N. MORTENSEN concurred.

POHLMAN, Judge:

¶1      Acting on an informant's tip of suspected drug activity, police officers approached Tu Fan Bui-Cornethan and an acquaintance (HT) in a darkened cul-de-sac and inquired about their activities. In the ensuing twelve minutes, Bui[1] and HT were separated and questioned, the men emptied their pockets, HT was frisked, and the area was searched. By their own admission, the officers found no evidence linking the men to illegal activity. But before the officers left, one asked Bui if he had any weapons

---

1. Consistent with the parties' briefing, we refer to the defendant as Bui.

on him. Bui denied that he was carrying, but when the officer told Bui he was going to frisk him, Bui admitted to having a handgun. Bui's weapon was retrieved, and the State charged him with, among other things, possession of a firearm by a restricted person.

¶2     Bui moved to suppress the evidence, but the district court denied the motion, concluding that Bui's Fourth Amendment rights were not implicated in what it deemed to be a consensual encounter. We disagree with the district court and reverse. We conclude that the motion to suppress should have been granted because the encounter was a level two seizure that was unlawfully extended when the officer inquired about the gun.

BACKGROUND[2]

¶3     Late one evening in May 2018, Officer Allred spoke on the telephone for ten to fifteen minutes with a citizen informant regarding suspicious activity in a cul-de-sac near Irving Street. After identifying himself and sharing his general address, the informant described what he believed to be drug-related activity in the neighborhood. The informant told Allred about a Hispanic male with tattoos on his face, along with "maybe some other individuals," who loitered around a black wrought iron fence in the area. The informant went on to explain that cars would pull up, the tattooed male would have a short exchange through the car windows, and then the vehicles would drive off. Based on Allred's training and experience, he believed the informant's tip described activity that was consistent with drug trafficking.

---

2. We recite the facts in detail because "the legal analysis of a search and seizure case is highly fact dependent." *State v. Hansen*, 2002 UT 125, ¶ 5, 63 P.3d 650 (cleaned up).

¶4    Officer Allred and his trainee, Officer Shupe, proceeded to the area described by the informant. There, at the end of a cul-de-sac, the officers found a black iron fence, which was at the edge of an apartment complex. The officers saw HT standing near the fence and Bui sitting on a cement block. HT matched the informant's description: Hispanic with tattoos on his face. The officers made a U-turn, parked facing the men, and shined their squad car's headlights and spotlight on Bui and HT. But they did not turn on the car's red and blue lights or siren.

¶5    With the fence to the men's backs, the uniformed officers approached to within five feet of the men, with Allred on their right and Shupe on their left. Allred asked, "What's going on gentlemen?" explaining that they were "investigating" because they "had some suspicious activity in this area." HT said that he was visiting his cousin who lived in a nearby apartment and that he "likes to hang out" in the area because the apartment was hot. During this questioning, a third officer, Officer Ruff, arrived at the scene. Ruff parked his police vehicle, with his headlights on, at the edge of the cul-de-sac. He then exited the car and stood next to HT who was now sitting on the cement block.

¶6    As Ruff arrived, Allred motioned to Bui with his hand and told him "to come over there and talk to [him] for a minute, by [his] car." Bui complied. Then, after asking Bui more questions, Allred asked Bui to wait by the car while he searched the area.

¶7    In his search, Allred found a discarded broken crack pipe near the fence.[3] Finding no other evidence of a crime, Allred returned to HT and asked, "Do you have anything on you?" HT replied that he had only his cell phone. Allred then asked,

---

3. Officer Ruff opined that it is not unusual to find randomly discarded drug paraphernalia in the area.

"Don't care if I look do you?" HT answered, "No, go ahead bro." Next, Allred instructed HT to stand up and proceeded to frisk him, but Allred found nothing. Allred asked HT one final time if he had any drugs on him. HT denied having any drugs and even turned out his pockets, showing Allred they were empty.

¶8 Allred then returned to Bui, who was still waiting in front of the squad car, and asked, "What about you?" Bui responded, "Sup bro?" And Allred clarified, "Got any drugs on you?" Bui stated that he did not. Allred then said, "Care if I check?" In response, Bui offered to empty his pockets and he revealed that they were empty except for a wallet. Bui then opened the wallet and showed its contents to Allred. It did not contain any drugs.

¶9 Allred told Bui that he and HT were in "a high crime area" and that their presence "over in the corner" was suspicious. Allred then pulled out a notepad and started taking Bui's information, including his name and where he lived. Allred then returned to HT and asked him for his address and whether he had been involved in a fight nearby earlier that night. By now, a fourth officer (and a third squad car) had arrived at the scene.

¶10 Officers remained "pretty close" to HT and Bui throughout the investigation. But Allred felt that the situation was fairly "low key" and that the two men "could easily have a legitimate reason to be there." Additionally, Allred did not believe that he had reasonable suspicion to detain Bui even after finding the broken crack pipe.

¶11 Finally, having found no drugs or evidence of a crime, Allred approached Officer Ruff, who had returned to his squad car. Ruff informed Allred that Bui was "one of our most notorious gangsters" and that he was associated with "all kinds" of gangs. Ruff also mentioned that Bui had been involved in shootings in the past. The exchange between Officers Allred and Ruff lasted about ninety seconds.

¶12   Nearly twelve minutes after arriving on the scene, Allred returned to Bui and asked, "You don't have any weapons on you, do you?" Bui responded, "No sir." Allred then instructed Bui, "Let me check real quick." Surrounded by all four officers, Bui raised his hands and asked whether it was "required for [them] to touch [him]." Allred responded, "I'm just going to pat you down, make sure you don't have any weapons," and then asked Bui again, "Do you have weapons on you?" This time, Bui admitted to having a handgun in his waistband. The other officers then handcuffed Bui while Allred located and removed the gun from Bui's waistband.

¶13   Bui was charged with theft by receiving stolen property,[4] possession of a firearm by a restricted person, and carrying a concealed firearm without a permit. Bui pleaded not guilty to the charges and filed a motion to suppress all evidence obtained as a result of the search, claiming the stop violated his Fourth Amendment rights. Bui argued that he was detained within the meaning of the Fourth Amendment and that his detention was not justified because the officers did not have a reasonable, articulable suspicion that he had been or was about to be engaged in criminal activity. Bui further argued, in the alternative, that even if the officers were justified in initially detaining him, they unlawfully extended the scope of the stop.

¶14   After an evidentiary hearing, the district court denied Bui's motion to suppress, ruling that "[t]he interaction between officers and [Bui] was a voluntary, level one encounter." The court also concluded, "[i]n the alternative," that the "officers had reasonable articulable suspicion to initiate a level two stop based on the citizen tip" and that the "scope of the stop was not

---

4. The State alleged that the handgun found on Bui previously had been reported as stolen.

unreasonably extended." Bui then entered a conditional guilty plea to possession of a firearm by a restricted person, reserving his right to appeal the denial of his motion to suppress.[5] Bui was sentenced to one to fifteen years at the Utah State Prison. He now appeals.

ISSUE AND STANDARD OF REVIEW

¶15    Bui contends that the district court erred in denying his motion to suppress evidence he contends was obtained in violation of the Fourth Amendment. "We review a trial court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. We review the court's factual findings for clear error and its legal conclusions for correctness, "including its application of law to the facts of the case." *Id.*; *see also State v. Martinez*, 2017 UT 43, ¶ 9, 424 P.3d 83 (explaining that in reviewing Fourth Amendment questions, appellate courts afford "no deference to the district court's application of law to the underlying factual findings").

ANALYSIS

¶16    The Fourth Amendment to the United States Constitution protects people "against unreasonable searches and seizures." U.S. Const. amend. IV. "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S 1, 8–9 (1968).

---

5. As part of the plea agreement, the other two charges were dismissed.

¶17   Utah courts recognize three different levels of constitutionally permissible encounters between police officers and citizens. *State v. Alverez*, 2006 UT 61, ¶ 10, 147 P.3d 425. A level one encounter is a "consensual encounter," which does not implicate the Fourth Amendment. *Id.* (cleaned up); *see also State v. Adams*, 2007 UT App 117, ¶ 10, 158 P.3d 1134. An officer may approach an individual and ask questions, but "[a]s long as the person . . . remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.); *see also Adams*, 2007 UT App 117, ¶ 10. On the other hand, a level two encounter is a seizure within the meaning of the Fourth Amendment. *Alverez*, 2006 UT 61, ¶ 10. It occurs "when the officer, by means of physical force or show of authority has in some way restrained the liberty of the person." *Adams*, 2007 UT App 117, ¶ 10 (cleaned up). To be constitutionally permissible, an officer must have a "reasonable, articulable suspicion" that a person has committed or is about to commit a crime before the person can be detained. *Alverez*, 2006 UT 61, ¶¶ 10, 14 (cleaned up). A level two "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id*. ¶ 10 (cleaned up). Finally, a level three encounter occurs when a police officer arrests a suspect based on probable cause that an offense has been or is being committed. *Id*.

¶18   Bui contends that his encounter with the police officers was a level two encounter, requiring the officers to have a reasonable, articulable suspicion that he had committed or was about to commit a crime. He contends that the officers lacked such suspicion and that his detention thus violated the Fourth Amendment. Bui further contends that even if the officers had reasonable suspicion to detain him, the detention was unlawfully extended after that suspicion had been dispelled.

¶19    In contrast, the State argues, and the district court determined, that the encounter was a consensual, level one encounter that did not trigger Fourth Amendment protections. The State alternatively argues (and the court concluded) that the officers had the requisite suspicion to detain Bui and that his detention was not unreasonably extended.

¶20    We agree with Bui. As we explain below, we conclude that Bui's encounter with the officers was a level two encounter that required reasonable suspicion to detain him. We further conclude that even assuming the officers had reasonable, articulable suspicion that Bui had committed or was about to commit a drug-related offense, the officers unreasonably extended the detention after that suspicion was dispelled.

A

¶21    "A level one encounter becomes a level two stop when a reasonable person, in view of all the circumstances, would believe he or she is not free to leave," *Adams*, 2007 UT App 117, ¶ 10 (cleaned up), or to "disregard questioning," *State v. Hansen*, 2002 UT 125, ¶ 39, 63 P.3d 650. "This is true even if the purpose of the stop is limited and the resulting detention brief." *Adams*, 2007 UT App 117, ¶ 10 (cleaned up). "Circumstances demonstrating that a level two stop is under way include the presence of more than one officer, the display of an officer's weapon, physical touching of the person, or use of commanding language or tone of voice." *Id.*; *see also Mendenhall*, 446 U.S. at 554 (opinion of Stewart, J.). Further, "the manner of questioning, the content of the questions, and the context in which the questions are being asked can convert mere questioning into a level two seizure if, under all of the circumstances," the questioning demonstrates "a show of authority sufficient to restrain [a person's] freedom of movement." *Alverez*, 2006 UT 61, ¶ 12 (cleaned up). With these principles in mind, and viewing the

circumstances in their totality, we conclude that Bui's encounter with the officers was a level two stop.

¶22    First, the presence of four armed and uniformed officers constituted a show of authority that escalated the nature of the detention. *See Adams*, 2007 UT App 117, ¶ 10 (stating that the presence of more than one officer supports finding a level two stop); *State v. Merworth*, 2006 UT App 489, ¶¶ 8–9, 153 P.3d 775 (recognizing that a seizure may be found where there was "the threatening presence of several officers"). The encounter began with two officers and two suspects, but in less than two minutes, a second police car appeared on the scene and a third officer joined Officers Allred and Shupe. And just a few minutes after that, another officer arrived in his squad car, bringing the total officers to four, outnumbering Bui and HT two-to-one. The State suggests that we should discount the number of officers by one because Shupe was only a trainee and Allred required qualified backup. But while we appreciate the officers' need for safety, we are tasked with viewing the circumstances from the objective perspective of a reasonable suspect, not from the unarticulated viewpoint of the officers. *See Alverez*, 2006 UT 61, ¶ 10; *see also Mendenhall*, 446 U.S. at 554 n.6 (opinion of Stewart, J.) ("[T]he subjective intention of [the officer] . . . is irrelevant except insofar as that may have been conveyed to the [suspect]."). And Bui was not told that Shupe was only a trainee, who "doesn't count as a backup officer." Rather, from a reasonable person's perspective, three squad cars and four uniformed officers appearing on scene within just a few minutes of one another would be viewed as a show of authority. Thus, this fact weighs in favor of finding a level two stop.

¶23    Second, the manner of the officers' approach was sufficiently confrontational that a reasonable person would view it as a show of authority. When Allred and Shupe spotted Bui and HT, they made a quick U-turn and parked directly in front of the men, illuminating them with the cruiser's headlights and

spotlight. Similarly, when the other two officers arrived, they too left their headlights on in the cul-de-sac. The officers' need to illuminate a darkened cul-de-sac is understandable. And the use of a spotlight, on its own, would not elevate a stop from a level one to a level two. *See State v. Justesen*, 2002 UT App 165, ¶¶ 14–16, 47 P.3d 936 (reversing a district court's conclusion that an officer's "activation of his overhead lights alone was sufficient to escalate the encounter to a level two stop"). But considering the officers' approach in its entirety, it supports the finding of a level two encounter.

¶24    Third, the content of the questions and the context in which they were asked also weigh in favor of finding a level two stop. At the outset, we note that we see no error in the district court's finding that the officers did not use "commanding language or tone of voice." But the fact that the officers' tone was conversational does not mean the inquiries were not accusatory. Allred asked Bui and HT what was "going on," but did so in the context of explaining that the officers were "investigating" "suspicious activity in this area," implying that Bui and HT may be participants in criminal activity. Further, Allred directly asked both Bui and HT if they were carrying drugs, invited both men to empty their pockets, frisked HT, and told Bui that because they were in a "high crime area" their presence "over in the corner" was suspicious. While there is no "per se rule that accusatory questioning will always create a level two encounter," *Merworth*, 2006 UT App 489, ¶ 12 (McHugh, J., concurring), a reasonable person may not feel free to walk away under circumstances where an officer's questioning and actions plainly telegraph that the officer believes the individual is presently engaged in the illegality the officers claim to be investigating, *see Alverez*, 2006 UT 61, ¶ 12 (concluding that the question, "Did you know your car is suspected as being involved in drug dealing?" was "accusatory in nature" and created a confrontational encounter demonstrating a show of authority (cleaned up)); *see also Hansen*, 2002 UT 125, ¶ 45

(expressing doubt about "whether a reasonable person," after being asked about contraband, "would feel free to leave before being issued a warning or citation, or at least being told he or she could leave").

¶25    This is especially true in this case, where Allred almost immediately separated Bui and HT and sought to control Bui's movement throughout the encounter. When officers first arrived, Bui was sitting on a concrete block with his back to the black iron fence. Rather than question Bui in that location, Allred directed Bui to move away from HT and to the front of the illuminated police cruiser. While Allred did not aggressively command Bui to move, his instruction—however stated—sought control of Bui's movement and suggested that he was not free to go about his business as he had been doing before the officers arrived. *See State v. Alvey*, 2007 UT App 161, ¶ 5 (finding a level two stop because the officer directed the individual where to stand and questioned him in front of the police cruiser's headlights); *see also Commonwealth v. Jones*, 378 A.2d 835, 840 (Pa. 1977) (finding the officer's request that an individual be seated in the car supported the conclusion that the individual was seized within the meaning of the Fourth Amendment because, "while stated as a question, it sought control of [the individual's] movement"). Similarly, Allred asked Bui to wait in front of the police cruiser while Allred searched the area where Bui had been sitting. Although phrased as a request, Allred's statement implied that he expected Bui not to leave until after Allred had completed his search, particularly because other officers remained close by when Allred stepped away. *See Adams*, 2007 UT App 117, ¶ 11 (explaining that a stop is more likely a level two when the officer steps away from the suspect to perform another task, such as a warrants check, and the suspect is presumably supposed to wait for the officer to return).

¶26    In sum, we conclude that Bui's encounter with the police was a level two seizure within the meaning of the Fourth

Amendment. Four police officers in three squad cars descended on Bui and HT in the dark of night to question them about their "suspicious activity." The officers maintained a respectful and casual tone throughout, but their approach was confrontational, Allred's questions were accusatory, and the officers displayed their authority by controlling Bui's movements, including by asking him to wait by a police car while they investigated further. Considering the totality of these circumstances, a reasonable person in Bui's position would not have felt free to walk away.

B

¶27   Because the encounter was a level two stop, the officers needed to have reasonable, articulable suspicion for the stop to survive scrutiny under the Fourth Amendment. *See Alverez*, 2006 UT 61, ¶ 10. The district court concluded that the informant's tip provided the officers with the requisite suspicion, and we assume, without deciding, that the district court was correct.

¶28   But even if the officers had the requisite suspicion to detain Bui, "officers must diligently pursue a means of investigation that is likely to confirm or dispel their suspicions quickly, and it is unlawful to continue the detention after reasonable suspicion is dispelled." *State v. Chism*, 2005 UT App 41, ¶ 12, 107 P.3d 706 (cleaned up). This means a stop that was within the bounds of the Fourth Amendment may become unlawful "by virtue of its intolerable intensity and scope" if the search is not "strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry v. Ohio*, 392 U.S. 1, 18–19 (1968) (cleaned up). Once the initial purpose of the stop has concluded, the person must be allowed to leave and any further detention, without additional reasonable suspicion, is an illegal seizure. *State v. Hansen*, 2002 UT 125, ¶ 31, 63 P.3d 650; *see also State v. Simons*, 2013 UT 3, ¶ 35, 296 P.3d 721 (explaining that the Fourth Amendment "allows for a de minimis extension at

any point *before* the conclusion of an otherwise lawful detention," but that once the purpose of the detention has concluded, further questioning without new reasonable suspicion is unlawful (emphasis added)); *State v. Baker*, 2010 UT 18, ¶ 28, 229 P.3d 650 ("Even a small intrusion beyond the legitimate scope of an initially lawful search is unlawful under the Fourth Amendment." (cleaned up)).

¶29 Bui argues that the stop was unlawfully extended because its purpose—to investigate suspected drug activity—had concluded before Allred inquired about weapons. Bui asserts that he should have been allowed to leave once there was no longer any reasonable suspicion that he was involved in the suspected illegal drug activity and that Allred's inquiries about having weapons on his person unlawfully prolonged the stop. The State disagrees. It contends that the stop was not unlawfully extended and that Allred's questions about weapons did not go beyond the stop's original scope because Allred's exchange with Officer Ruff was "[t]o further investigate the reported drug activity."

¶30 It can be difficult to discern the exact moment when reasonable suspicion has been dispelled and the purpose of a stop has concluded. *See, e.g.*, *Simons*, 2013 UT 3, ¶ 50 (Lee, J., concurring) (stating that the "line designating the formal conclusion of a stop for Fourth Amendment purposes" may be "fuzzy" and difficult "to referee"). But based on the record before us, we agree with Bui that before Allred asked about weapons, the purpose for the detention had concluded because Allred had dispelled whatever reasonable suspicion he had that Bui had committed or was about to commit a drug-related offense.

¶31 Based on the informant's tip, Allred suspected that Bui was engaged in street-level drug trafficking. Thus, the purpose of the stop was to investigate that suspicion. To confirm or

dispel it, Allred asked Bui for his name and address and questioned him about what he was doing in the area. Allred also searched the area for evidence of a drug-related crime and found only a discarded crack pipe, which was not unusual for the area and which he did not consider to be Bui's. Allred also asked Bui if he had any drugs on him, and when Bui said no, Allred had Bui empty his pockets and even examined the contents of Bui's wallet to confirm that he did not have any drugs on his person. Each of these actions was reasonably likely to dispel whether Bui had been or was about to be involved in a drug-related crime. Indeed, Allred testified that he did not believe he had reasonable suspicion to detain Bui.

¶32   At that point, Bui should have been "allowed to depart." *See Hansen*, 2002 UT 125, ¶ 31. But rather than allow Bui to go about his business, Allred left Bui's side to speak with Ruff. Ruff then explained that he knew Bui from past experience and that Bui had been involved in gang activity and had been known to carry firearms. The State contends that this exchange of information was in furtherance of Allred's investigation into the reported drug activity. But the State's claim is purely speculative. Allred testified that after questioning Bui, searching the area, and having Bui empty his pockets, he lacked reasonable suspicion to detain Bui. Yet he continued the investigation without explaining how making additional inquiry of Ruff, who had been called in for backup, was reasonably related to dispelling or resolving his original suspicion. *See Rodriguez v. United States*, 575 U.S. 348, 356 (2015) ("On-scene investigation into other crimes, however, detours from [the stop's] mission."). And without a reasonable basis to prolong the investigation by speaking to Ruff, the further detention of Bui and the subsequent weapons search and arrest were unlawful. *See Chism*, 2005 UT App 41, ¶ 22 ("With no continuing reasonable suspicion, [the officer's] detention of [the suspect] to further investigate the validity of his identification, and the resulting arrest and search, were all unlawful."); *see also Hansen*, 2002 UT 125, ¶ 32

(concluding that questioning a driver about alcohol, drugs, and weapons in his vehicle unlawfully extended the traffic stop where the officer had already verified the driver's license and registration and completed his computer check); *State v. Bissegger*, 2003 UT App 256, ¶¶ 19–20, 76 P.3d 178 (concluding that the suspect's successful completion of a field sobriety test dispelled suspicion that he was driving under the influence and thus the officer's subsequent request to search the car was unlawful).[6]

¶33 In summary, "[i]f football is a game of inches, Fourth Amendment jurisprudence can be a matter of seconds." *State v. Adams*, 2007 UT App 117, ¶ 19, 158 P.3d 1134 (Orme, J., dissenting). Although Allred's inquiry of Ruff lasted only ninety seconds, it unlawfully extended the scope of Bui's detention because there is no evidence that it was reasonably related to the

---

6. The State argues that *Chism* and *Hansen* are not comparable because "[n]either case involved a reasonable suspicion of drug activity—something not so easily verifiable with a driver's license or easily resolved through issuing a citation." We acknowledge that reasonable suspicion of drug activity may generally be more difficult to dispel than suspicion of a traffic violation or underage tobacco possession. But that does not change the fact that there is an absence of record support for the State's assertion that Allred's inquiries of Ruff were reasonably related to the informant's tip. Because there is no evidence that Allred asked Ruff questions relating to the drug dealing allegations, we are in no position to simply assume that Allred's inquiries of Ruff were reasonably related to dispelling the suspicion that gave rise to the stop. *See State v. Chism*, 2005 UT App 41, ¶ 15, 107 P.3d 706 (stating that to be permissible under the Fourth Amendment, investigative acts that prolong a detention must be "reasonably related to dispelling or resolving the articulated grounds for the stop" (cleaned up)).

purpose of the stop. Allred and the other officers detained Bui based on an informant's tip of street-level drug trafficking near Irving Street. Allred efficiently dispelled that suspicion by questioning Bui, searching the area, and having Bui empty his pockets. After suspicion was dispelled, Allred continued investigating Bui without new reasonable, articulable suspicion. Thus, Bui's continued detention and the officers' resulting search was unlawful, and the evidence obtained should have been suppressed. *See Terry*, 392 U.S. at 29 ("[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation.").

CONCLUSION

¶34 The encounter between Bui and the officers was a level two stop because, in view of all the circumstances, a reasonable person would not have felt free to disregard the officers' questioning and walk away. And assuming the officers had reasonable, articulable suspicion to initially detain Bui for suspected drug activity, Allred's exchange with Ruff about weapons unlawfully extended the stop because it occurred after that suspicion had been dispelled. We therefore reverse the district court's order denying Bui's suppression motion and remand to the district court to allow Bui to withdraw his guilty plea and for such other proceedings as may now be appropriate.

───────────